**SMITH SETZER & SONS, INCORPORATED; Neil Setzer, individually and as President and shareholder of Smith Setzer & Sons, Incorporated, Plaintiffs–Appellants,**

v.

**SOUTH CAROLINA PROCUREMENT REVIEW PANEL; Hugh Leatherman; Grady L. Patterson, Jr.; Glenn F. McConnell; Luther L. Taylor, Jr.; Jules J. Hesse; Roy E. Moss; Kiffen R. Nanney; Gus J. Roberts; Carol Baughman, as officers and members of the South Carolina Procurement Review Panel; Carroll A. Campbell, Jr., Governor; Grady L. Patterson, Jr.; Earle E. Morris, Jr.; James W. Waddell, Jr.; Robert N. McLellan; Jesse A. Coles, Jr., as officers**

and members of the South Carolina Budget and Control Board, division of General Services; South Carolina Budget and Control Board, a division of General Services; James J. Forth, Chief Procurement Officer for the South Carolina Budget and Control Board, a division of General Services, Defendants–Appellees.

No. 93–1111.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 26, 1993.

Decided April 11, 1994.

**ARGUED:** David Clifford Eckstrom, Nexsen, Pruet, Jacobs & Pollard, Columbia, SC, for appellants. Arthur Camden Lewis, Lewis, Babcock & Hawkins, Columbia, SC, for appellees.

**ON BRIEF:** Martin Pannell, Martin & Monroe Pannell, P.A., Conover, NC, for appellants. Cameron B. Littlejohn, Jr., Pete Kulmala, Lewis, Babcock & Hawkins, Columbia, SC, Suann White, South Carolina Procurement Review Panel, Columbia, SC, for appellee Members of Procurement Review Board; James W. Rion, Division of General Services, Columbia, SC, for appellee Members of Budget and Control Board.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and SMITH, United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Chief Judge ERVIN wrote the opinion, in which Judge PHILLIPS and Judge SMITH joined.

## OPINION

ERVIN, Chief Judge:

This case challenges the constitutionality of South Carolina's legislatively-enacted program under which certain South Carolina products and South Carolina vendors are given slight preferences in the bidding process for certain types of state procurement. For the reasons set forth below, we affirm the judgment of the district court and sustain the statutes.

I

A

The South Carolina Code and implementing regulations establish two separate preference schemes, one covering local products and the other local vendors, both of which are challenged here. Section 1–11–35 states a general preference that the State and its constituent administrative and educational bodies should purchase South Carolina goods over those of other states or countries if such goods are available; otherwise, it should purchase United States goods before purchasing those of other countries.[1] The statute di-

---

1. The statute states:
   The State Budget and Control Board by regulation shall develop and implement a policy whereby this State, and its agencies, departments, institutions of higher learning, boards, commissions, and committees in procuring necessary products to perform their assigned duties and functions must obtain products made, manufactured or grown in South Carolina if available or must obtain products

rects the State Budget and Control Board to implement this policy preference, which it has done in S.C.Code Regs. 19–446.1000 (Supp.1992). That regulation states:

> Competitive procurements made by governmental bodies, including the General Assembly, shall be of end-products made, manufactured or grown in South Carolina if available, and if not available, of the same or similar end-products made, manufactured or grown in other states of the United States, before the same or similar foreign-made, manufactured or grown end-products are procured, provided that ... (3) *the cost of the end-product is not unreasonable.*

*Id.* 19–446.1000(C) (emphasis supplied). Under the regulation's definition of "unreasonable," a South Carolina good will be purchased so long as its price is no more than five percent higher than the price of a non-South Carolina product, while a United States product will be purchased so long as its price is no more than two percent higher than the price of a foreign good.[2]

In addition, § 11–35–1520 of the Code establishes a modest preference for local vendors. Under this section, a "resident vendor" is to be awarded any procurement contract[3] of less than $2,500,000 in value so long as that vendor's bid "does not exceed the lowest qualified bid from a nonresident vendor by more than two percent of the latter bid." S.C.Code Ann. § 11–35–1520(9)(e) (Law.Co-op.Supp.1992). For contracts greater than $2,500,000, resident vendors are accorded a one percent preference over non-resident vendors. *Id.* The term "resident vendor" is expansively defined to include: an individual, partnership, association, or corporation that is authorized to transact business within the State, maintains an office in the State, maintains a representative inventory of commodities on which the bid is submitted or is a manufacturer which is headquartered and has a ten million dollar payroll in South Carolina and the product is made or processed from raw materials into a finished end product by such manufacturer or an affiliate (as defined in Section 1563 of the Internal Revenue Code) of such manufacturer, and has paid all assessed taxes.

*Id.*

The resident vendor and local product schemes have been interpreted by the procurement agencies to apply cumulatively. Thus, on certain bids the 5% local product preference can be cumulated with the 2% maximum resident vendor preference to arrive at a 7% preference over bids from non-resident vendors offering goods from outside South Carolina.

### B

Smith Setzer & Sons, Incorporated ("Smith Setzer") is a North Carolina corporation that maintains its headquarters in Ca-

---

made, manufactured, or grown in the United States if similar South Carolina products are not available before any foreign made, manufactured, or grown products may be procured. S.C.Code Ann. § 1–11–35 (Law.Co-op.1986).

**2.** The regulation's full definition of "unreasonable" is as follows:

> The cost of an end-product made, manufactured or grown in South Carolina is unreasonable if the bid or offer exceeds by more than five percent the lowest qualified bid or proposal on the same end-product which is made, manufactured or grown in other states of the United States, or in a foreign country or territory. The cost of an end-product made, manufactured or grown in the other states of the United States is unreasonable if the bid or offer exceeds by more than two percent the lowest qualified bid or proposal on the same end-product which is made, manufactured or grown in a foreign country or territory.

*Id.* 19–446.1000(B)(5). In addition, certain categories of purchases are wholly exempted from this preference scheme. Thus, permanent improvements to real estate, contracts with prime contractors or subcontractors providing materials or services relating to permanent improvements for real estate, and solicitations where the price of a single unit of the item sought is greater than $10,000 or where the total cost of the solicitation is less than $2,500 are not covered by this preference system.

**3.** Certain types of contracts are exempted from this preference scheme as well. Under the statute, preferences do not apply to prime contractors or subcontractors related to the construction industry or to procurements involving items where the price of a single unit is greater than $10,000. *Id.*

**1316**

tawba, North Carolina. It manufactures reinforced concrete pipe at plants in North Carolina, Virginia, and Georgia. While it sells its product to purchasers within South Carolina, it does not maintain offices or representative inventory there. It is thus not able to claim either South Carolina's local product preference or its resident vendor preference.

On August 13, 1989, the South Carolina Division of General Services issued an invitation to bid on a one-year contract to supply concrete culvert pipe to various state agencies and local political subdivisions within South Carolina. Local political subdivisions had the option to purchase concrete culvert pipe under the contract, and some local governments did so as a matter of administrative convenience to avoid conducting their own competitive solicitations. The invitation to bid disclosed that the contract would be awarded on a per lot basis, there being one lot for each of South Carolina's 46 counties. Smith Setzer submitted bids on this contract and claimed the United States product preference, although it could not claim the local product or resident vendor preferences.[4] Despite being the low bidder on at least 14 lots, Smith Setzer was awarded only two lots.

On December 18, 1989, the South Carolina Department of Highways and Public Transportation issued an invitation for bids on a contract to supply reinforced concrete culvert pipe to various locations. Award again would be on a per lot basis. Although Smith Setzer was the low bidder on one lot of the contract, it was not awarded the contract because of the application of the state's preference system.

Smith Setzer exhausted its administrative appeals in both instances, to no avail. Smith Setzer and Neil Setzer, the president of Smith Setzer as well as a shareholder, then brought two suits in district court challenging the local product and resident vendor

preferences as violative of the Due Process and Equal Protection Clauses of the Fourteenth Amendment and their counterpart South Carolina provisions, the Privileges and Immunities Clause of Article IV and its South Carolina counterpart, and the Commerce Clause. The suits were consolidated, and the matter proceeded to trial, at which time the district court reaffirmed a prior ruling dismissing the Privileges and Immunities Clause claim, and also dismissed Neil Setzer as a party to the case for lack of standing. Following trial, the district court issued a written order ruling in favor of the defendants on all remaining grounds and sustaining the statutes and regulations.

On appeal, Neil Setzer challenges the district court's ruling dismissing his claim based on the Privileges and Immunities Clause of Article IV for lack of standing. Smith Setzer renews its challenge based on the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment. We address these issues in turn.

**II**

Neil Setzer contends that the district court erred in dismissing, for lack of standing, his claim that the operation of the State's preference schemes in this instance violated the Privileges and Immunities Clause of Article IV.[5] He brings this claim not on behalf of the corporation, for he concedes, as he must, that it is settled law that "the Privileges and Immunities Clause is inapplicable to corporations." *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 656, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981) (citing *Hemphill v. Orloff*, 277 U.S. 537, 548–50, 48 S.Ct. 577, 579–80, 72 L.Ed. 978 (1928)).[6] Instead, he claims that, as a shareholder of the corporation, the corporation's loss of revenue and earnings resulting from the operation of the

4. Smith Setzer does not challenge the constitutionality of the United States product preference under the South Carolina preference scheme.

5. The Privileges and Immunities Clause provides that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1.

6. Thus, not only is Smith Setzer barred from bringing a Privileges and Immunities Clause claim, but Neil Setzer cannot rely on third party standing doctrine as the predicate for his claim, since there is no "jus tertii" on which such a claim can be based. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).

preference scheme was a loss of income to him as well, and that this injury gives him standing to assert this claim.

Neil Setzer relies heavily on *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486 (7th Cir. 1984), for support of his position. But that case does not speak to the question here. In *Bernardi*, the Seventh Circuit addressed the constitutionality of an Illinois statute requiring that contractors working on state public works projects employ only Illinois residents on such projects. The parties to the case included Custom Contracting Company, an unincorporated association of Missouri residents hired by W.C.M. Window to perform part of a contract it held with the Decatur public school board, as well as several individual members of Custom Contracting. While the court stated that an unincorporated association lacked standing to bring a Privileges and Immunities Clause claim, *id.* at 492–93, it proceeded to address that claim on the merits, relying on the presence of individual claimants who were "natural persons," a requirement first set out in *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 177, 19 L.Ed. 357 (1869). Thus, the Seventh Circuit barred the claim of the association while allowing the association's members to maintain the claim. Neil Setzer argues that the instant situation is analogous and urges us to reinstate his Privileges and Immunities Clause claim.

There is a crucial difference between these cases, however, in the fact that Custom Contracting Company was an unincorporated association while Smith Setzer is an incorporated entity. In deciding to conduct business through a corporate form, the shareholders of a corporation limit their exposure to direct personal liability to the value of their shares. A corporation is treated, for Privileges and Immunities Clause purposes among others, as a separate entity. *Hemphill v. Orloff*, 277 U.S. 537, 549–50, 48 S.Ct. 577, 579, 72 L.Ed. 978 (1928).

It is considered a "fundamental rule" that "[a] shareholder—even the sole shareholder—does not have standing to assert claims alleging wrongs to the corporation." *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731 (2d Cir.1987), *cert. de-nied*, 488 U.S. 825, 109 S.Ct. 74, 102 L.Ed.2d 50 (1988). This is the rule in North Carolina, the state of Smith Setzer's incorporation, even as to "wrongs or injuries to the corporation which result in depreciation or destruction of the value of [a shareholder's] stock." *Process Components, Inc. v. Baltimore Aircoil Co.*, 89 N.C.App. 649, 366 S.E.2d 907, 912 (1988) (citation omitted), *aff'd per curiam*, 323 N.C. 620, 374 S.E.2d 116 (1988). The only exception to this rule is "where the injury to individual stockholders results from a special duty owed to the stockholder by the wrongdoer and having an origin independent of plaintiff's status as stockholder." *Id.* While this rule, which recognizes that corporations are entities separate from their shareholders in contradistinction with partnerships or other unincorporated associations, is regularly encountered in traditional business litigation, it also has been uniformly applied on the infrequent occasions it has arisen in suits against the state for statutory or constitutional violations. *See, e.g., Jones v. Niagara Frontier Transp. Auth., supra; Smith v. Martin*, 542 F.2d 688 (6th Cir.1976), *cert. denied*, 431 U.S. 905, 97 S.Ct. 1697, 52 L.Ed.2d 388 (1977); *Erlich v. Glasner*, 418 F.2d 226 (9th Cir.1969); *Sawmill Products, Inc. v. Town of Cicero*, 477 F.Supp. 636 (N.D.Ill.1979).

In this case, all bids were submitted by the corporation, Smith Setzer. Any injury to Neil Setzer comes from the application of the preference scheme to undercut Smith Setzer's low bids, resulting in the loss of revenue and earnings to Smith Setzer. If, counterfactually, Neil Setzer had submitted bids as an individual, or if Smith Setzer were not incorporated, he would have standing to assert this claim. But the bids here were the corporation's, and so is the injury. Neil Setzer does not show the type of individualized harm that is necessary to support such a claim. Instead, all injury is merely "derivative" of the injury to the corporation, which is not constitutionally cognizable under the Privileges and Immunities Clause. Although Neil Setzer wishes to discard the separate entity doctrine in this instance, such an action would vitiate the established rule against corporate standing in its entirety, while dis-

regarding settled theory of corporate law. "Such an action ... would authorize multitudinous litigation and ignore the corporate entity.... ·Simply stated, the claimed damages are those of the corporation, not those of the appellant." *Erlich,* 418 F.2d at 228.

Finally, the fact that Smith Setzer is a "subchapter S" corporation is of no matter. Under 26 U.S.C. § 1361(a), to be eligible as an S corporation the entity must be a "small business corporation," which is a "domestic corporation" that meets the various requirements of 26 U.S.C. § 1361(b). While an S corporation is treated differently for taxation purposes, it remains a corporation in all other ways, and it and its shareholders are separate entities. This being the case, Neil Setzer lacks standing to assert this claim.

### III

■■■■ The Commerce Clause provides that "The Congress shall have the Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. While this clause explicitly speaks only to the power of Congress to regulate interstate commerce, it also has · been interpreted, through a long line of cases, to "contain[ ] an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Western & Southern,* 451 U.S. at 652, 101 S.Ct. at 2074 (footnote omitted). In the absence of validating Congressional action,

> [t]his "negative" aspect of the Commerce Clause prohibits economic protectionism— that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism.

*New Energy Co. v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988) (citations omitted).

■■■■ While the negative Commerce Clause is a significant check on state action, it does not reach its every facet. Thus, the negative Commerce Clause has been restrict-ed to apply only where the state acts as a market regulator, exercising its taxing, regulatory or other police powers, and is inapplicable in situations in which the state acts as a market participant similar to private actors in the market. *White v. Massachusetts Council of Constr. Employers, Inc.,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); *Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). The justification underlying this distinction arises from the fact that the negative Commerce Clause is animated by a desire to prevent states from erecting barriers that "imped[e] free private trade in the national marketplace." *Reeves,* 447 U.S. at 437, 100 S.Ct. at 2277. Because state participation in the market, even participation that is frankly discriminatory in excluding foreign interests from receiving its benefits, does not establish barriers within the general market framework that impede interstate commerce, such activity falls outside the scope of the negative Commerce Clause. Thus, a preliminary question for Commerce Clause analysis must be "whether the challenged program constitute[s] direct state participation in the market," *White,* 460 U.S. at 208, 103 S.Ct. at 1044–45 (internal quotations omitted), for if it does, that is the end of the inquiry.

■■■ Smith Setzer concedes that, insofar as the State acted as a market participant in purchasing concrete pipe for its own purposes, its action is immune to Commerce Clause challenge. It attempts to argue, however, that the State also acted as a market regulator in this purchasing scheme because of the "regulatory effect" on local governments that resulted from the ability of local governments, at their option, to purchase their own concrete pipe requirements under the State contracts awarded.

Smith Setzer once again seeks support for its position in *W.C.M. Window Co. v. Bernardi, supra.* That case declared unconstitutional a statute that required all contractors to employ only Illinois laborers on "any public works project or improvement for the State of Illinois *or any political subdivision, municipal ·corporation or other governmen-*

*tal unit thereof.*" 730 F.2d at 489 (emphasis supplied).

The court acknowledged that Illinois could bind itself to such a preference. *Id.* at 495 ("[I]f the State of Illinois had limited the preference law· to construction projects financed (in whole or part) or administered by the state, it would be clear after *White* that the law did not violate the commerce clause."). But it believed "the state has gone further" by binding every local government unit as well. *Id.* While the court recognized that "for many purposes, including for many federal purposes such as those behind the due process and equal protection clauses of the Fourteenth Amendment, every local government unit in Illinois is a part of the state government," *id.*, the panel went on to assert that this was not true "for the purpose of evaluating Illinois' preference law under the commerce clause." *Id.* It based this assertion on the reasoning that, at least in those cases where there is no state financial support or supervision involved in the project in question, "[t]he state is a regulator, telling thousands of local government units that they must not give construction contracts to employers of non-residents," *id.*, and that "extending *Reeves* and *White* to cases where the state's relationship to its local agencies is purely regulatory could do great damage to the principles of free trade on which the negative commerce clause is based." *Id.* at 496.

*Bernardi* is factually distinguishable from the case at hand. Unlike the Illinois statute that mandated local obedience to its strictures, here there was no such compulsory element. The Division of General Services issued an invitation for bids to provide concrete culvert pipe to various state agencies, indicating also that local political subdivisions would have the option of purchasing pipe under the contract prices established through this bidding process. While local governments could enter the market and undertake their own solicitations, they were given the opportunity to avoid the administrative inconvenience and attendant search costs of doing so and to "free ride" instead on the state's effort. Unlike the mandatory regulatory picture that *Bernardi* paints on its facts, here the state can best be seen perhaps as a buying co-operative that enforces certain rules on members (the constituent state agencies) but that is also open to non-members (local governmental subdivisions) as well.[7]

In addition to the factual differences between *Bernardi* and the instant case, we do not believe that *Bernardi* reflects the better view regarding the parameters of the market regulator/market participant distinction· under the negative Commerce Clause. We acknowledge *Bernardi*'s concern that local governmental procurement is often a significant market force and that a rule allowing the state to bind not only its constituent agencies and departments but also its political subdivisions may have a not insignificant impact on free trade. These considerations are well-founded in economic theory.

Nevertheless, we agree with the Third and Ninth Circuits that the distinction *Bernardi* draws between state and local governments simply does not make sense in this constitutional matter. *Big Country Foods, Inc. v. Board of Educ.,* 952 F.2d 1173, 1179 (9th Cir.1992); *Trojan Technologies, Inc. v. Pennsylvania,* 916 F.2d 903, 911 (3d Cir. 1990), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). There is little analytic reason to treat the two separately for Commerce Clause purposes; market participation by *either* is immunized from negative Commerce Clause attack. *White,* 460 U.S. at 208, 103 S.Ct. at 1044. State rules that "regulate" the market actions of a state's constituent agencies, departments and other state-level organizational manifestations are conceded not to be considered "market regulating" for negative Commerce Clause purposes. To posit then that the state is "regulating" the market in requiring local governments to abide its rules thus only sidesteps the actual inquiry here, which is to determine at what point the state stops regu-

---

7. As the State points out in its brief, "[S.C.Code Ann.] § 11–35–40 applies only to 'governmental bodies,' and [S.C.Code Ann.] § 11–35–310(18) excludes all local government from the term 'governmental bodies.'" Brief of Appellees at 18. There is thus no mandatory preference impressed upon local governments by the Procurement Code.

lating itself and its action in the market *qua* market participant (a type of action immune from attack) and begins regulating non-state actors (a type of action subject to attack).

This having been stated, we cannot discern a valid distinction to explain why state regulations that bind local governmental units should not be considered equally as innocuous, constitutionally speaking, as state regulations that bind state-wide governmental units. Rather than focus on the state's action to see whether it is "regulatory," or on the quantitative impact of the regulation involved, the proper inquiry is into *whom* the state regulates: so long as the regulated party is a public entity, we do not believe the market participant doctrine's bounds are exceeded.

In this instance, the state entered the market to purchase a product for its own consumption, an action clearly outside the scope of the negative Commerce Clause. It also allowed certain local political subdivisions to "free ride" on its purchasing order at their option. Whatever "regulatory" element that this path incorporated is not of a type that implicates the concerns underlying the negative Commerce Clause. For this reason, we affirm the district court and reject the Commerce Clause challenge to South Carolina's preference schemes.

### IV

■ Finally, we turn to Smith Setzer's challenge under the Equal Protection Clause of the Fourteenth Amendment.[8] Both parties agree that the statutes and regulations at issue here concern themselves with a type of economic activity that does not impact any suspect or quasi-suspect class or fundamental right, and that the "rational basis" standard of review is therefore appropriate. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); *New Orleans v. Dukes,* 427 U.S. 297,

303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). Thus, "[t]he general rule is that [the] legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. "[I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, that cannot stand consistently with the Fourteenth Amendment." *Dukes,* 427 U.S. at 303–04, 96 S.Ct. at 2517. This analysis presents two questions for review. First, we must determine whether the purpose that animates these laws and regulations is legitimate. Second, we must determine whether it was "reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose." *Western & Southern,* 451 U.S. at 668, 101 S.Ct. at 2083. We address these matters in turn.

### A

■ Smith Setzer asserts that the purpose of the statutes and regulations under review is illegitimate and fails the first prong of the analytic test. In support, it cites *Metropolitan Life Insurance Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985). We disagree.

■ In *Ward,* the Supreme Court rejected as illegitimate the purposes advanced to support an Alabama insurance code provision that taxed foreign insurance companies at a rate higher than that to which domestic companies were subject. The state asserted that the primary purpose for the statute,[9] the promotion of domestic industry, was one that the Court long had accepted as legitimate. While acknowledging that "a State's goal of bringing in new business is legitimate and often admirable," *id.* at 879, 105 S.Ct. at 1682, the Court soundly rejected an articula-

---

8. The Equal Protection Clause provides that "No State shall ... deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

9. Under the provisions of the statute, foreign insurance companies could narrow the tax difference by investing certain amounts in specified

assets and securities. The state advanced a second purpose, the encouragement of capital investment in certain Alabama assets and governmental securities, to support this aspect of the statute, which the Court also rejected on the same reasoning. *Id.* 470 U.S. at 882–83, 105 S.Ct. at 1684.

tion of the rule at that level of abstraction. Instead, the Court stated:

> Alabama's aim to promote domestic industry is purely and completely discriminatory, designed only to favor domestic industry within the State, no matter what the cost to foreign corporations also seeking to do business there. Alabama's purpose ... constitutes *the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent.*

*Id.* at 878, 105 S.Ct. at 1681 (emphasis supplied). One reading of this and other passages in the opinion suggests a rule, urged upon us by Smith Setzer, that *any* line-drawing that distinguishes between domestic and foreign persons is impermissible. No law on its face is *per se* violative of the Equal Protection Clause; whatever the standard of review, the state always is given the opportunity to show that the law has a proper purpose and is sufficiently closely tailored to the achievement of that purpose before a court will determine whether that clause has been violated. Therefore, we take it that the approach to *Ward* suggested above relies not on a bald assertion that any law that draws lines involving state borders is *per se* unconstitutional, but rather that a state can never articulate a legitimate state purpose that will validate a law that makes such distinctions.

We cannot accept such an assertion. Particularly in cases involving a state's provision of benefits to its citizens, such an approach would lead to perilous results. If states, in our great federal system, may serve as laboratories in which to "try novel social and economic experiments without risk to the rest of the country," *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), so too may they undertake such experiments and confine the benefits to their citizens, whose welfare and tax monies ultimately are at risk. Thus, the rule Smith

Setzer urges could not be limited to the facts of this case, and would raise serious questions regarding the ability of a state to limit to its own residents the receipt of various benefits that are presently considered to be at the core of state-governmental responsibility, such as "the enjoyment of state educational institutions, energy generated by a state-run plant, fire and police protection, and agricultural improvements and business development programs." *Reeves,* 447 U.S. at 442, 100 S.Ct. at 2280. We do not believe that the Supreme Court intended *Ward* to bring such results, and we reject this reading of the case.

■ Instead, we believe the better approach to understanding *Ward* focuses not on establishing a bright-line rule but rather on inquiring into whether the state can come forward with a legitimate reason justifying the line it has drawn.[10] The Equal Protection Clause concerns itself with preventing "unconstitutional discrimination by the States." *Id.* at 881, 105 S.Ct. at 1683. Because all, or almost all, state action results in some persons being benefitted while others are burdened, the Equal Protection Clause stands to ensure that the line drawn between the two groups has some modicum of principled validity, through its scrutiny of both the purpose animating the statute as well as the way the line is set. In *Ward,* Alabama asserted that the distinction the statute made was legitimate simply because it would benefit certain individuals (i.e., domestic insurance companies). But the Court interpreted Alabama's approach to suggest that the mere fact that the law benefitted some individuals could be taken not only as the *result* of the line-drawing but also as the *purpose* legitimating the line being drawn in the first place. In short, the Court viewed Alabama as attempting to bypass the standard inquiry into the legitimacy of the purpose that ani-

---

**10.** This does not mean that the fact that a line is drawn with reference to a state border is irrelevant. Unlike the approach rejected above, which attempted to use the domestic/foreign distinction to establish a *per se* invalid rule that bypassed the traditional inquiry into the legitimacy of an articulated purpose, under this second approach such a distinction remains an important factor to consider in the true inquiry into whether a state has advanced a legitimate reason for its action. For if it is true that there will be instances in which the state border provides a useful and legitimate line of demarcation, there also will be instances in which it acts as a capricious or protectionist line. Only by focusing on the reasons advanced to explain distinctions drawn with reference to state borders can the former be distinguished from the latter.

mated the line-drawing process with an *ipso facto* assertion that all lines that benefit some parties are legitimate.

Because the Court believed that "under the State's analysis, *any* discrimination subject to the rational relation level of scrutiny could be justified simply on the ground that it favored one group at the expense of another," *id.* at 882 n. 10, 105 S.Ct. at 1684 n. 10 (emphasis in original), and that such an approach "would eviscerate the Equal Protection Clause in this context," *id.* at 882, 105 S.Ct. at 1683, the Court rejected this approach. Instead, the Court demanded not only that Alabama state that the line being drawn would benefit some group (a truism), but also that it articulate some legitimate reason for the line to be drawn at all. Looking into the second matter, the Court perceived no legitimate reason on the basis of the (procedurally odd) record before it to explain why the line had been drawn; indeed, it saw nothing more than "the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Id.* at 878, 105 S.Ct. at 1681. But rather than strike down the law on the grounds that the articulated purpose was illegitimate, the Court remanded it to give Alabama and the state courts the opportunity to see whether a more legitimate reason could be found on which to sustain the statute. *Id.* at 875 n. 5, 105 S.Ct. at 1680 n. 5 ("The State and the intervenors advanced some 15 additional purposes in support of the Alabama statute. . . . On remand, the State will be free to advance again its arguments relating to the legitimacy of those purposes.").

The approach outlined above explains the opposite result reached in *Northeast Bancorp, Inc. v. Board of Governors,* 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), decided later that same term. In that case, the Court addressed an equal protection challenge to complex Connecticut and Massachusetts statutes limiting the acquisition of domestic banks to bank holding companies with their principal place of business within

another of the New England states that had enacted reciprocal legislation. While Justice O'Connor, who authored an extended and biting dissent in *Ward,* noted in concurrence in *Northeast Bancorp* that she failed to see the difference between a statute such as Alabama's that affected 49 states and statutes such as these that burdened only 44 states, *id.* at 179, 105 S.Ct. at 2556 (O'Connor, J., concurring), the difference in this instance was that the states advanced a purpose, beyond Alabama's naked preference,[11] that the Court found satisfied the testing of rationality review. The Court deemed this legislation to be legitimate, despite the "parochial discrimination" that it facially presented, because "banking and related financial activities are of profound local concern." *Id.* at 177, 105 S.Ct. at 2555 (internal quotation omitted). "[T]he historical fact that our country traditionally has favored widely dispersed control of banking," *id.,* sufficed to sustain the statute. The Court's scrutiny clearly was not rigorous; it merely asked for the states to articulate some reason for the statutes beyond the fact that they favored those they favored, and having received such a reason, the Court sustained them from attack.

Taken together, *Ward* and *Northeast Bancorp* thus suggest not that the Court has adopted "Commerce Clause rhetoric in equal protection clothing," *Ward,* 470 U.S. at 880, 105 S.Ct. at 1682, but merely that courts should continue to apply the standard test of rational review even in areas where the Commerce Clause is inapplicable, and that there are indeed some instances where the articulated purpose of a statute is so lacking in legitimacy that it will be struck down. *See generally Sunstein, supra;* Lawrence H. Tribe, *American Constitutional Law* 1442 n. 17 (2d ed. 1988).[12] This approach avoids the distorting effects that some foretold from this opinion, *see Ward,* 470 U.S. at 883, 900–02, 105 S.Ct. at 1684, 1693–94 (O'Connor, J., dissenting); William Cohen, Federalism in

---

11. *See generally* Cass R. Sunstein, Naked Preferences and the Constitution, 84 *Colum.L.Rev.* 1689 (1984).

12. We thus disagree with the Third Circuit's suggestion, taken up by the State in its brief, that *Ward*'s approach is limited to the area of tax legislation. *See Trojan Technologies,* 916 F.2d at 915.

Equality Clothing: A Comment on *Metropolitan Life Insurance Co. v. Ward*, 38 *Stan. L.Rev.* 1 (1985), and places the case squarely within the developed equal protection jurisprudence.

Turning to the specific case at hand, it remains for us to discern the reasons underlying the statute and evaluate their legitimacy while according the state the "wide latitude" that is emblematic of such relaxed scrutiny. *Dukes*, 427 U.S. at 303, 96 S.Ct. at 2517. It must be acknowledged at the outset that the challenged enactments do make distinctions with reference to state boundaries. While this sharpens our concern into the legitimacy of the line-drawing enterprise, *see* note 10, *supra*, we believe in this instance that the enactments are indeed motivated by legitimate state purposes. As the South Carolina Supreme Court indicated in rejecting an earlier equal protection challenge to this preference scheme:

> The statute is designed to protect South Carolina's legitimate interest in directing benefits, generated by state purchases, to the citizens of South Carolina—"the people who fund the state treasury from which the purchases are made and the people whom the state was created to serve."

*Gary Concrete Prods., Inc. v. Riley*, 285 S.C. 498, 331 S.E.2d 335, 339 (1985). We believe that the allocation of the tax money generated from the citizens of a state is as much a "matter of profound local concern" as was the subject matter of the statutes in *Northeast Bancorp*, and that rules stating a preference that such monies be recycled within the local economy, either through the purchase of locally-produced products or through purchases from local vendors, rather than funnelled out of state, reflect legitimate state concerns. Focusing not on the line but on the purpose behind it convinces us that, unlike legislation drawing a similar distinction at state boundaries in the regulatory mode, *see Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1876), the fact that this legislation involves "a desire to channel state benefits to the residents of the State supplying them," *Reeves*, 447 U.S. at 443 n. 16, 100 S.Ct. at 2280 n. 16, validates the enactments here challenged. We thus hold that the statutes

satisfy the first prong of the equal protection challenge.

**B**

We now address the question of the rationality of the classification scheme embodied in this statute. If the classification is "'at least debatable,'" the law will stand, *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (*quoting United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)), for as long as the legislature *"could rationally have decided"* that its action would further its goal, the Equal Protection Clause is satisfied. *Id.* 449 U.S. at 466, 101 S.Ct. at 725 (emphasis in original).

Smith Setzer relies heavily on the testimony of Dr. Steven Craig, a University of Houston economist, to demonstrate that local preference schemes do not benefit state economies because the result of such parochial legislation is in fact a net economic loss. The district court found that, even assuming Dr. Craig's testimony was correct, it was insufficient to invalidate the law, since Smith Setzer did not negate every conceivable basis supporting a preference scheme.

Even if we accept Dr. Craig's assertions and believe that this law does not achieve the benefits its purpose suggests, it is not our place to substitute our judgment for that of the democratic body that enacted these statutes. Indeed, "the judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Dukes*, 427 U.S. at 303, 96 S.Ct. at 2516. Instead, the burden lies on Smith Setzer to convince us that, at the time of the enactment of these statutes and regulations, the legislature could not reasonably have conceived that the reinvestment of tax dollars into the community, even when it calls for purchasing goods for more than the lowest price available, would benefit its constituent citizenry. *See Clover Leaf Creamery*, 449 U.S. at 464, 101 S.Ct. at 724.

Smith Setzer set out to prove that the government's actions were inimical to its in-

tentions. But as indicated above, that is not the proper approach. Rather, the question to be answered is whether there is no reasonable conception that could justify the state's action and whether the legislative actors were cognizant of this at the time they acted. In the absence of evidence of such arbitrary and irrational behavior on the part of the legislature, the statute must survive rationality review. Because we find the rationality of the statute to be at least debatable, and because Smith Setzer thus has not demonstrated that the statute represents a "wholly arbitrary act," *Dukes,* 427 U.S. at 303, 96 S.Ct. at 2517, we believe the statute survives the second prong of the equal protection challenge.

## V

South Carolina's legislature has enacted a statute that aims to improve the local economy by channelling tax dollars back into the community. We do not sit to judge the wisdom of this route, nor is it for us to supplant the State's methods for achieving its objectives, so long as the Constitution is not offended in the process. Finding no party to bring the Privileges & Immunities Clause claim, it must fail. And finding that the statute offends neither the Commerce nor Equal Protection Clauses, we hereby affirm the district court.

*AFFIRMED.*