CHANCE MANAGEMENT, INC., a South Dakota corporation, and William A. Sanders, a Wyoming resident, Plaintiffs,

v.

STATE OF SOUTH DAKOTA; Mark W. Barnett in his official capacity as Attorney General of South Dakota; the South Dakota Lottery; Susan Walker, in her official capacity as Executive Director of the South Dakota Lottery; and H.I. King, Beverly McCracken, Elaine Emery, Don Bender, Burdette Solum, and John E. Carmody, Sr., in their official capacities as members of the South Dakota Lottery Commission, Defendants.

Civ. No. 94–3002.

United States District Court,
D. South Dakota,
Central Division.

Feb. 21, 1995.

---

1. "Maintain" means to continue or carry on. Webster's New Riverside University Dictionary 717 (1984).

Steven W. Sanford, Cadwell, Sanford & Deibert, Sioux Falls, SD, for plaintiffs.

Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, SD, for defendants.

Lee M. McCahren, Vermillion, SD, for S.D. Lottery.

## MEMORANDUM OPINION AND ORDER

JOHN B. JONES, Senior District Judge.

Plaintiff Chance Management, Inc. (Chance) is a South Dakota corporation whose majority stock ownership is held by plaintiff William A. Sanders (Sanders), a Wyoming resident. SDCL § 42–7A–43 restricts licenses for video lottery machine operators (machine operators) to South Dakota residents, or partnerships or corporations whose majority ownership is held by South Dakota residents. After Chance was denied a video lottery machine operator's license, the plaintiffs brought this suit to challenge the constitutionality of the residency requirement.

Both sides moved for summary judgment. For the reasons set out below, summary judgment will be granted to the defendants.

### Background

The South Dakota Lottery commenced operation in 1989. 1989 S.L., ch. 374. It is regulated in considerable detail by the South Dakota Lottery Commission. SDCL Ch. 42–7A. The lottery business is broken down by statute into four divisions, each of which is separately licensed. SDCL § 42–7A–41.

The video lottery machine manufacturers and video lottery machine distributors are separately licensed, and their roles in the business are self-explanatory. The video lottery establishment or retailer operates the premises where the machines are available to the public for play.

The machine operator purchases the video lottery terminals (machine) from the distributor and owns, maintains and places the machines in the retail establishments.

The State of South Dakota dictates to manufacturers the electronic circuitry required and owns the programs in the logic boards and the Erasable, Programmable Read Only Memory (EPROM) chips in the machines. The state's central computer is connected to each machine and controls payouts and maintains a record of the machine's usage.

The state's share of the net machine revenue generated by each machine started at 22 per cent, is now at 37 per cent, and legislation is pending to raise it to 50 per cent. The state's share is collected every two weeks from the machine operator by means of electronic "sweeps" of the operator's bank account.

### Discussion

Chance and Sanders challenge the video lottery operator license residency requirement on the basis that it violates the Commerce Clause, the Equal Protection Clause, and the Privileges and Immunities Clause of the United States Constitution. These issues will be addressed in that order.

*I. Commerce Clause.*

The Commerce Clause reserves to Congress the power to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The state argues that the residency requirement is not subject to Commerce Clause scrutiny because the state is acting as a market participant.

The market participant exception has been recognized by the United States Supreme Court in three instances: *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), (holding that the state of Maryland was a participant in the market of purchasing junk car hulks through a bounty system); *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), (holding that the South Dakota State Cement Plant was a market participant as a seller of cement products); and *White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), (holding that the city of Boston was acting as a market participant when it contracted for public works construction).

It has also been the subject of law review articles, including Dan T. Coenen, *Untangling the Market–Participant Exemption to the Dormant Commerce Clause*, 88 Mich. L.Rev. 395 (1989) and Barton B. Clark, Comment, *Give 'Em Enough Rope: States, Subdivisions and the Market Participant Exception to the Dormant Commerce Clause*, 60 U.Chi.L.Rev. 615 (1993).

The Supreme Court cases "make clear that if a State is acting as a market participant, rather than a market regulator, the dormant Commerce Clause places no limitation on its activities." *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 93, 104 S.Ct. 2237, 2243, 81 L.Ed.2d 71 (1983) (citations omitted). The rationale for this exception is that the state, having entered a market, should be allowed to operate freely as any other business would in that market. "[T]he Commerce Clause responds principally to state tax and regulatory measures impeding free private trade in the national marketplace. There is no indication of a constitutional plan to limit the ability of States themselves to operate freely in the free market." *Reeves*, 447 U.S. at 436–37, 100 S.Ct. at 2277 (cita-

tions omitted). "[T]he competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis." *Id.* at 439, 100 S.Ct. at 2279. These considerations favor leaving the states unfettered when acting as a market participant.

■ This case is a perfect example of that mix of concerns. The record convinces me that the State of South Dakota is a market participant with the machine operators in the operation of the South Dakota State Lottery for a number of reasons.

First, the enterprise has always been known as the "State Lottery", SDCL Ch. 42–7A, which at least implies that the state has a controlling interest in its operation and management.

Second, the state dictates the makeup of the electronic programs and chips built into the machines.

Third, the state requires that all machines be connected with and controlled by the state's central computer system, including controlling the payouts of the machines.

Fourth, the state requires that each machine be given an ID number which is programmed into its logic board and EPROM chip, to permit the state to track the machine and its key internal components.

Fifth, the substantial investment in the state's central computer system, software, personnel and equipment to allow the operation of the video lottery is clearly a proprietary interest.

Sixth, the state takes a share of the net take of the machines, now 37%, which far exceeds any reasonable regulatory license fee, and being a very substantial portion of the gross profit generated by the machines, makes this proprietary interest even stronger.

And, finally, the state controls the lottery business in great detail through its statutes, SDCL Ch. 42–7A, and regulations adopted by the South Dakota lottery commission, S.D.Admin.Rules, Title 48.

The gambling business differs from other types of commerce because of the potential for cheating, abuse or criminal infiltration. This provides motivation to retain control over the business to the fullest extent practicable. In this case, the video lottery can only be played on machines within the state of South Dakota, so there is no concern over the restraint of the national or foreign market in gambling.

The determination would be clearer if the state contracted with, rather than licensed, the operators. However, a contractual relationship has never been required for the market participant exception. *See Hughes v. Alexandria Scrap*, 426 U.S. at 803, 96 S.Ct. at 2494 (bounty on junk car hulks not based on contract).

The case falls more closely in line with the facts and reasoning of *White* than the regulatory line of cases such as *South–Central Timber Development*. South Dakota is a market participant in the video lottery business, and the Commerce Clause challenge must fail. "Nothing in the purposes animating the Commerce Clause prohibits a state, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Alexandria Scrap*, 426 U.S. at 810, 96 S.Ct. at 2498 (footnote omitted).

Market participation distinguishes this case from *Gulch Gaming, Inc., v. South Dakota*, 781 F.Supp. 621 (D.S.D.1991). In that case, the Court found that the residency requirements for Deadwood gaming operator and retail licenses in SDCL § 42–7B–25 violated the Commerce Clause. Deadwood gambling is privately owned and operated; the state merely regulates these activities and collects license fees and taxes, which are distributed as set forth by statute. *See* SDCL Ch. 42–7B. No state market participation is involved in Deadwood gambling operations.

*II. Equal Protection Clause.*

Both Plaintiffs and Defendants agree that the standard to be applied in this case is that of the rational basis test because no fundamental right or suspect class is implicated. *See City of Cleburne v. Cleburne Living Ctr.,*

*Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

In setting up the video lottery business, the state was commencing a gambling operation different from that which had ever operated in South Dakota, or for that matter, anywhere else in the country. Gambling is generally understood to have a greater tendency to attract criminal infiltration than most other types of business enterprises.

Video lottery as established by statute made the machine operator the most important player in the lottery business: the operator owned the machines, placed them in the retail establishments, serviced them, and handled all the money generated by the machines. The state could have rationally believed that resident machine operators would be less likely to bring to South Dakota employees with criminal backgrounds or tendencies than would non-resident machine operators. *Fendrich v. Van DeKamp*, 182 Cal. App.3d 246, 227 Cal.Rptr. 262, 270 (1986) (state has a legitimate interest in preventing corruption in authorized gambling). It could also rationally believe that it would be easier to collect the state's share of the revenue from resident machine operators than non-resident machine operators.

The legitimate purposes of the state in this case are rationally related to the residency requirement. In addition to factors previously stated, it also clearly encourages local economic development in the state, maximizes local revenues from video lottery, and could reduce some investigative costs. As long as the legislature *"could rationally have decided"* the requirement furthers legitimate state goals, the Equal Protection Clause is satisfied. *Minnesota v. Cloverleaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981) (emphasis in original).

The business reasons for the residency requirement, in addition to the concerns over avoiding crime-related problems, distinguish this case from *Gulch Gaming*, 781 F.Supp. 621.

The state expressed legitimate reasons for the residency requirement, and "the Equal Protection Clause permits economic regula-

tion that distinguishes between groups that *are* legitimately different—as local institutions so often are." *Northeast Bancorp v. Board of Governors of Fed. Reserve Sys.,* 472 U.S. 159, 180, 105 S.Ct. 2545, 2556, 86 L.Ed.2d 112 (O'Connor, J. concurring). The rational basis test is satisfied unless

> there is no reasonable conception that could justify the state's action and ... the legislative actors were cognizant of this at the time they acted. In the absence of evidence of such arbitrary and irrational behavior on the part of the legislature, the statute must survive rationality review.

*Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel,* 20 F.3d 1311, 1324 (4th Cir.1994). The Court cannot say that the rationality of the connection between the residency requirement and the state's purposes is so lacking as to make it a "wholly arbitrary act" inconsistent with the Equal Protection Clause. *New Orleans v. Dukes,* 427 U.S. 297, 303–04, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976).

## III. Privileges and Immunities Clause.

■ A corporate plaintiff is not a "citizen" as that term is used in the Privileges and Immunity Clause and it is settled law that the Clause is inapplicable to corporations. *Western & Southern Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 656, 101 S.Ct. 2070, 2077, 68 L.Ed.2d 514 (1981). William A. Sanders, as an individual, also asserts that his rights under the Clause are violated by the residency requirement. The state challenges his standing to assert this claim.

■ Shareholders with an identifiably direct and personal interest in a cause of action can bring suit individually to assert rights that also implicate the corporation's rights. *Franchise Tax Bd. v. Alcan Aluminum, Ltd.,* 493 U.S. 331, 336, 110 S.Ct. 661, 665, 107 L.Ed.2d 696 (1990). The shareholder must also have suffered an "injury in fact" caused by the challenged state statute, which would likely be redressed by the relief sought. *Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Sanders is not injured in any way separate from the corporation by the residency requirement. Sanders can be a director, employee or corporate officer of the corporation without triggering the residency restriction of SDCL § 42–7A–2. That restriction only prevents the corporation from gaining a license in South Dakota to operate video lottery.

Sanders' cites *Cooper v. McBeath,* 11 F.3d 547 (5th Cir.1994) as supporting his argument that he has standing to assert a Privileges and Immunities claim. That case is factually distinguishable. The nonresident minority shareholders in that case held an option to purchase the remaining shares in a corporation that had already secured a Texas liquor permit.

■ The shareholders challenged the state permit residency requirement which prevented them from gaining majority ownership while maintaining the liquor permit. The shareholders brought suit individually. The court in *Cooper* did not address the question of whether the Privileges and Immunities clause was violated. The rights Sanders seeks to assert are those of the corporation only, and as to the Privileges and Immunities Clause, he has no injury in fact separate from the corporation. He has no standing to assert this claim. *Smith Setzer & Sons,* 20 F.3d at 1316–18.

### Conclusion

Commerce Clause restrictions do not apply in this case because the state is acting as a market participant. The Equal Protection Clause is not violated because the state has legitimate purposes which are rationally related to the residency requirement. Plaintiff Sanders has no standing to challenge the statute as to the Privileges and Immunities Clause.

Therefore, upon the record herein,

IT IS ORDERED:

(1) That Plaintiffs' Motion for Summary Judgment, Doc. 16, is denied.

(2) That Defendants' Cross–Motion for Summary Judgment, Doc. 24, is granted.

214

(3) The Clerk of Courts shall enter a Judgment in favor of the Defendants in accordance with this Order.