_____

No. 95-1665
_____

Chance Management, Inc., a          *
South Dakota corporation;           *
William A. Sanders, a               *
Wyoming resident,                   *
                                    *
      Plaintiffs - Appellants,      *    Appeal from the United States
                                    *    District Court for the
      v.                            *    District of South Dakota.
                                    *
State of South Dakota; Mark W.      *
Barnett, in his official            *
capacity as Attorney General of     *
South Dakota; South Dakota          *
Lottery; Susan Walker, in her       *
official capacity as Executive      *
Director of the South Dakota        *
Lottery; H. I. King, in his         *
official capacity as member of      *
the South Dakota Lottery            *
Commission; Beverly McCracken,      *
in her official capacity as         *
member of the South Dakota          *
Lottery Commission; Elaine          *
Emery, in her official capacity     *
as member of the South Dakota       *
Lottery Commission; Don Bender,     *
in his official capacity as         *
member of the South Dakota          *
Lottery Commission; Burdette        *
Solum, in her official capacity     *
as member of the South Dakota       *
Lottery Commission; John E.         *
Carmody, Sr., in his official       *
capacity as member of the South     *
Dakota Lottery Commission,          *
                                    *
      Defendants - Appellees.       *


                          _____

                Submitted:  November 17, 1995

                  Filed:  October 10, 1996
                          _____

Before HANSEN, LAY, and MURPHY, Circuit Judges.

_____

HANSEN, Circuit Judge.

A corporation may obtain a license as a video lottery machine operator for the South Dakota Lottery only if residents of South Dakota hold the majority ownership interest in the corporation. S.D. Codified Laws Ann. § 42-7A-43 (Supp. 1995). Chance Management, Inc., and William A. Sanders filed this suit, challenging the constitutionality of the residency requirement under the Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, and the Privileges and Immunities Clause. The district court[1] granted the defendants summary judgment. The court concluded that Commerce Clause restrictions do not apply to the statute because the state of South Dakota is acting as a market participant in the video lottery business. The court further held that the statute does not violate the Equal Protection Clause and that the plaintiffs have no standing to assert the Privileges and Immunities Clause challenge. The plaintiffs appeal. We affirm.

**I.**

In South Dakota, various forms of gambling are legal. See S.D. Codified Laws Ann. §§ 42-7-47 to -106 (1991 & Supp. 1996) (horse and dog racing); id. §§ 42-7A-1 to -55 (South Dakota Lottery); id. §§ 4242-7B-1 to -62 (card games and slot machines). South Dakota owns and operates one of the gaming enterprises in South Dakota, the South Dakota Lottery, which is a video lottery business. Video lottery consists of games of chance played on a computer-controlled video machine, simulating the games of poker, blackjack, keno, and bingo. South Dakota operates its video

_____

[1]The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2

lottery business in accordance with Article III, Section 25 of the South Dakota Constitution, which, as amended in 1994,[2] reads as follows:

> The Legislature shall not authorize any game of . . . lottery . . . . However, it shall be lawful for the Legislature to authorize by law, a state lottery or video games of chance, or both, which are regulated by the state of South Dakota, either separately by the state or jointly with one or more states, and which are owned and operated by the state of South Dakota, either separately by the state or jointly with one or more states or persons, provided any such video games of chance shall not directly dispense coins or tokens.

Chapter 42-7A of the South Dakota Codified Laws establishes the state's video lottery under the direction of an independent state agency, the South Dakota Lottery Commission (the Commission). S.D. Codified Laws Ann. § 42-7A-2 (Supp. 1995). This chapter creates a detailed statutory scheme governing South Dakota's video lottery business. See id. § 42-7A-1 to -55. An executive director administers the lottery pursuant to the provisions of Chapter 42-7A, id. § 42-7A-2, and under the rules and regulations promulgated by the Commission, id. § 42-7A-21.

South Dakota controls and operates its video lottery business in large part through a central computer system, which is located in the main office of the South Dakota Lottery in Pierre, South Dakota. Although the state does not own the video machines on which the games of chance are played or the modems attached to the

---

[2]The South Dakota Lottery began operating in October 1989. In 1994, the Supreme Court of South Dakota declared that the state was not actually running a lottery, but games of chance, in violation of the South Dakota Constitution. Poppen v. Walker, 520 N.W.2d 238 (S.D. 1994). The South Dakota Legislature responded by passing a joint resolution amending the South Dakota Constitution to allow the South Dakota Lottery. The voters of South Dakota approved the proposed constitutional amendment, and in November 1994, under the amended Article III, Section 25 of the South Dakota Constitution, video lottery operations again commenced.

machines, it owns the dominant software programs that operate the machines.

asable, Programmable, Read Only Memory (EPROM) chips
in the video machines, without which the machine
EPROM chips contain the data that protects and secures the system fro
invasion by outside influences.  In
state spent two million dollars on the central computer system, personnel,


Video lottery machine operators (operators) own the individual video
and are responsible for their operation and maintenance.  (J.A.
es or associated equipment
for   thorized play in licensed video lottery establishments in South
a, including restaurants, bars, lounges, or lodging establishment
licensed to sell alcoholic beverages on the premises.  S.D. Codified Laws
§§ 42-7A-1(6) (defining "licensed establishment"), -1(17) (defining
e operator").  The state bills the operators for its
portion                                    by electronically sweeping the
operators' bank accounts.  S.D. Admin. R. 48:02:
share                                                       t
dec     this case; the South Dakota Legislature has since increased the


All video lottery machine manufacturers, distributors, and operators
obtain a license from the executive director of the South Dakot
Lottery in order to do business with the Lottery.  S.D. Codified Laws Ann.
42-7A-41.  Before issuing a license to any of these parties, the state
a background investigation to ascertain whether the applicant
ies  for  a  license.  ___  §§  42-7A-43  (investigation),  -13
ifications), -14 (ineligible persons); _____ S.D. Admin. R.
02:02:01 (additional qualification requirements for licensure).
corporate applicant cannot obtain a license until each person who has the

4

majority of the corporation's board of directors has passed the requirements set out for individual applicants. S.D. Admin. R. 48:02:02:02.

In addition to passing the background investigation, a person must be a resident of South Dakota to obtain a video lottery machine operator's license. S.D. Codified Laws Ann. § 42-7A-43. If the party seeking an operator's license is a corporation, a majority of the ownership interest in the corporation must be held by South Dakota residents in order to qualify for a license. Id.

Plaintiff Chance Management, Inc., is a corporation organized under the laws of the state of South Dakota and is owned by two persons. Plaintiff William A. Sanders, a resident of Wyoming, owns the majority (51%) of the stock in Chance Management, with the remaining shares (49%) owned by a South Dakota resident. Chance Management applied for a video lottery operator's license but was turned down because its majority shareholder failed to meet the residency requirement under § 42-7A-43.

Chance Management and Sanders filed this suit against the state of South Dakota, the executive director of the state lottery, and various members of the state Lottery Commission. Plaintiffs challenged the constitutionality of the residency requirement under the Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, and the Privileges and Immunities Clause. Both sides filed motions for summary judgment. The district court granted the defendants' motion, holding that the statute does not run afoul of either the Commerce Clause or the Equal Protection Clause. The court further held that the plaintiffs lacked standing to mount the Privileges and Immunities Clause challenge. See Chance Management, Inc. v. South Dakota, 876 F. Supp. 209, 211-13 (D.S.D. 1995). Chance Management and Sanders appeal.

review the district court's grant of summary judgment de novo
Independent _____, 82 F.3d 791, 795 (8th Cir.
Summary judgment is appropriate when the evidence, viewed in the
most favorable to the nonmoving party, shows there is no genuine
of material fact and the moving party is entitled to judgment as a
of law.  ___; Cotto Waxo Co. v. Williams, 46 F.3d 790, 792 (8th Cir.
1995).

## A.  Commerce Clause Challenge

Under the Commerce Clause of the Constitution of the United States, "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U.S. Const. art. I, § 8, cl. 3.  This clause acts not only as an affirmative grant of regulatory power to Congress, but also "as a restriction on permissible state regulation." Hughes v. Oklahoma, 441 U.S. 322, 326 (1979).  "This `negative' or `dormant' aspect of the Commerce Clause prohibits economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." Charities, 82 F.3d at 798 (citing New Energy Co. of Indiana v. Limbach, 486 U.S. 269, 273 (1988)).

Because the power granted to Congress under the Commerce Clause is the power to "regulate Commerce . . . among the several States," the correlative restrictions on the states under the Commerce Clause are invoked only when a state engages in regulation.  Therefore, the Supreme Court has drawn a distinction between state "regulation of" a market and state "participation in" a market. SSC Corp. v. Town of Smithtown, 66 F.3d 502, 510 (2d Cir. 1995), cert. denied, 116 S. Ct. 911 (1996). See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 93-95 (1984) (plurality opinion); White v. Massachusetts Council of Constr. Employers, 460

U.S. 204, 208 (1983); Reeves, Inc. v. Stake, 447 U.S. 429, 436-37 (1980); Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 808-10 (1976).  A state acting as a market participant is free from the strictures of the Commerce Clause because "there is no indication that the [Commerce] Clause was intended to limit the ability of the [s]tates themselves to operate in the free market."  Charities, 82 F.3d at 799.  States acting in a proprietary capacity should be as free from federal constraints as are private market participants.  Id.

We agree with the district court's conclusion that South Dakota's video lottery statute, including its residency requirement, falls within the market participant exception to the Commerce Clause.  To begin with, the statute created a state business within the gaming market.  South Dakota invested substantial sums of money to get the South Dakota Lottery off the ground.  The state owns the dominant software programs that operate the video lottery machines and owns the computer system that controls the machine payouts.  Moreover, the state presently reaps 50 percent of the revenue generated by the South Dakota Lottery.  Thus, South Dakota is actively running a business in the gaming market.  In furtherance of its money-making enterprise, the state has created a business relationship with its video lottery machine operators much akin to a partnership or joint venture between private parties.  Because South Dakota's choice of its "business partners" is made in its role as a market participant, its decision to deal only with corporations owned in major part by South Dakota residents is beyond the purview of the Commerce Clause.  "[T]he [s]tate, like any private [gaming company], has a right to select the parties with whom it will deal."  Id.  The lure of the huge profits to be made in the gaming market proved too attractive for the legislature.  Instead of just taxing or regulating the other participants in the market, the legislature opted instead to be the largest participant, to own and to operate a huge piece of the

7

action. That it is the dominant actor in the market does not mean it is not a participant.

The plaintiffs argue that the state is not acting as a market participant because it is not acting as a buyer, seller, or employer. The plaintiffs base this argument on the roles the states played in the three Supreme Court cases applying market participant exception. See White, 460 U.S. at 205-06 (employer); Reeves, 447 U.S. at 432 (seller); and Alexandria Scrap, 426 U.S. at 799 (buyer). The reasoning of these cases, however, does not support the plaintiffs' argument. The Court's inquiry in the market participation cases asks not whether the state is acting as a buyer, seller, or employer when it participates in a market, but whether the state is actually participating in a narrowly defined market as a proprietor rather than simply regulating the actions of other private market participants. Wunnicke, 467 U.S. 94-95 (explaining White, Reeves, and Alexandria Scrap), 97-98 (explaining that a state must actually be participating in the specific market it is regulating for the market participation exception to apply) (plurality opinion). We do not believe that it can seriously be questioned that South Dakota has invested substantial money and effort into participating in the narrowly defined gaming market as a proprietor.

The plaintiffs argue that the residency requirement is the functional equivalent of the statute the district court declared unconstitutional in Gulch Gaming, Inc. v. South Dakota, 781 F. Supp. 621 (D.S.D. 1991). The statute at issue in Gulch Gaming imposed a residency requirement on operators or retailers engaged in gaming in Deadwood, South Dakota. S.D. Codified Laws Ann. § 42-7B-25. Although the statute at issue in Gulch Gaming appears to be analogous to the one presently before us, the state's role in Gulch Gaming was entirely different from its role here. In Gulch Gaming, the state had no ownership interest in the gaming activity and was acting solely as a regulator of gambling conducted by private

8

businesses in Deadwood.  Here, however, the residency requirement reflects a decision by the state taken as an owner and operator of the gaming business.

The plaintiffs also contend that the residency requirement falls outside the market participation exception because the residency requirement is unrelated to the state's participation in a private market. Plaintiffs point to the fact that the state imposes a number of requirements on video lottery machine manufacturers and restricts the manufacturers' sales of the machines to licensed distributors and operators.  Plaintiffs argue that under Wunnicke, this restriction violates the Commerce Clause.

Wunnicke involved a Commerce Clause based constitutional challenge to a requirement that timber harvested from Alaska state-owned lands be processed in Alaska prior to export.  467 U.S. 84-86.  In its market participant discussion, the Court first defined the relevant market, concluding that Alaska was a market participant in the timber industry as a seller of timber, but was not a market participant in the timber processing industry.  Id. at 98.  A plurality of the Court concluded that requiring private parties who purchased timber from the state of Alaska to process their timber in Alaska was a downstream regulation outside of the relevant market in which Alaska was participating and therefore not within the bounds of the market participation exception.  Id. at 99.  The Court explained:

> The limit of the market-participant doctrine must be that it allows a State to impose burdens on commerce within the market in which it is a participant, but allows it to go no further. The State may not impose conditions, whether  by statute, regulation, or contract, that have a substantial regulatory effect outside of that particular market.  Unless the "market" is relatively narrowly defined, the doctrine has the potential of  swallowing  up  the  rule  that  States  may  not  impose substantial burdens on interstate commerce even if they

9

act with the permissible state purpose of fostering local industry.

Id. at 97-98.

This language indicates that the market participant exception is limited to the actual market in which the state is participating, and to that extent, the plaintiffs' assertion that the statute must be related to the state's participation is correct. Once we determine that the state is participating in the relevant market, however, we do not scrutinize, under Commerce Clause analysis, whether the state's proprietary decisions best meet the state's goals. We further note that unlike Alaska in Wunnicke, South Dakota is actually participating in the market affected by the legislation at issue in this case. Moreover, the residency requirement for video lottery machine operators does not reach beyond those parties who are actually and freely dealing with the state in its business enterprise.

The plaintiffs rely on GSW, Inc. v. Long County, 999 F.3d 1508 (11th Cir. 1993), to support a broader interpretation of the import of Wunnicke. In GSW, the Eleventh Circuit held that the county was not a market participant where a county resolution geographically limited the sources of the solid waste that a local private waste disposal facility could take. The facts of GSW are fundamentally different from those before us today, because the county had no investment in the market in which it asserted it was participating and had even made sure it would not be subject to any liability. By contrast, South Dakota has put substantial sums of money at risk in entering the gaming market. Furthermore, our analysis is simply not altered by the court's language that, under Wunnicke, "courts will scrutinize `the relationship of the subject matter of the contract [or legislation] and the condition imposed.'" GSW, 999 F.2d at 1516 (citation omitted). Rather, that is precisely what we have done.

10

Our analysis is consistent with the Supreme Court's decision in Wyoming v. Oklahoma, 502 U.S. 437, 461 (1992). In that case, Oklahoma argued that it was acting as a market participant because it owned a utility. Notwithstanding Oklahoma's participation in the market, the Court held that Oklahoma could not require private utility companies to purchase a certain percentage of coal from Oklahoma sources. The Court distinguished between a state's imposition of limitations on its own utility business and the regulation of private companies, noting that the statute "would become a fundamentally different piece of legislation were it construed to apply only to the [state-owned utility company]." Id. at 461. If the case before us today involved a residency requirement for corporations doing business with private gaming companies in which the state had no proprietary interest, this case would be like Wyoming v. Colorado.[3] However, we are considering "a fundamentally different piece of legislation"; the statute at issue in this case "applies only to the [state-owned gaming company]." Id. As such, the state's residency requirement falls within the market participation exception to the Commerce Clause.

The dissent correctly notes that the Supreme Court struck down the entire statute in Wyoming v. Oklahoma, declining the state's invitation to construe the legislation as applying only to the state-owned utility. We do not believe, however, that the Court's decision not to construe the statute as severable or as intended to apply only to the state-owned utility affects our analysis. Indeed, as we have pointed out, the Court expressly distinguished legislation such as that before us, and left to "the Oklahoma Legislature to decide whether it wishe[d] to burden [its] state-owned utility when private utilities will otherwise be free of . . . restrictions." Id. See also SSC Corp. v. Town of Smithtown, 66 F.3d 502, 512 (2d Cir. 1995) (holding that, although the county was

---

[3]Indeed, such a statute was struck down by the district court in Gulch Gaming.

11

a market participant in the waste disposal business, the county could not compel private parties to buy services from the local incinerator), <u>cert. denied</u>, 116 S. Ct. 911 (1996); <u>Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders</u>, 48 F.3d 701, 717 (3d Cir. 1995) (holding that the state was not a market participant when it was using its regulatory power to go beyond its own participation and to control the market activities of private market participants); <u>Swin Resources Sys., Inc. v. Lycoming County</u>, 883 F.2d 245, 250 (3d Cir. 1989) (upholding allegedly discriminatory rules concerning the county's landfill because they did "not apply to private landfills and d[id] not apply beyond the immediate market in which [the county] transact[ed] business."). The issue before us does not involve the state using "its regulatory power to control other[] participants in the [gaming] market." <u>Atlantic Coast Demolition & Recycling, Inc.</u> 48 F.3d at 717. Rather, it involves a decision integral to the state's choice, as a business, as to whom it will deal with as operators.

The state's use of a licensing scheme rather than a contractual agreement does not take this case outside of the market participation doctrine, as the plaintiffs contend. <u>See, e.g.,</u> <u>Alexandria Scrap</u>, 426 U.S. at 808-10 (holding that a state was acting as a market participant in its statutory scheme of giving in-state scrap processors preferential treatment); <u>Charities</u>, 82 F.3d at 799-800 (holding that a statute determining the eligibility for participation in a state employees' charitable fund raising drive falls within the market participation doctrine). The state, like any private gaming company, is free to choose those with whom it will deal, be it through licensure or contract.

The plaintiffs and the dissent argue that South Dakota's involvement in virtually every aspect of the South Dakota Lottery, as expressed in South Dakota's amended constitution and state legislation, reveals that the state is actually regulating the

12

market.  We agree that the state's involvement is pervasive, but cannot agree that this involvement is regulation of "the market."  To the contrary, we believe the state is administering its own business.  The state, like the private gaming companies, is entitled to manage its business.

Finally, the plaintiffs argue that the market participation exception does not apply to this case because, by state constitutional mandate, the state of South Dakota has a monopoly in the video lottery business in South Dakota.  Thus, the plaintiffs argue, the state is acting in its sovereign capacity.  The Ninth Circuit Court of Appeals used this reasoning in Western Oil & Gas Ass'n v. Cory, 726 F.2d 1340 (9th Cir. 1984), aff'd without opinion by an equally divided Court, 471 U.S. 81 (1985).  In that case, the state of California passed a statute and promulgated regulations, charging oil refining companies by volume for transporting petroleum in pipelines over and across state-owned tidelands and submerged lands.  When the companies filed a Commerce Clause challenge to the statute and regulations, the state argued that it was a market participant in the petroleum transport business.  The Ninth Circuit disagreed, focusing on the permanency of the plaintiffs' refining facilities, which did not allow the plaintiffs any option but to lease from the state the submerged and tidewater lands upon which their pipelines rested.  The court held that, under those facts, where the state had a monopoly and the companies had no choice but to renew their leases, the state was acting in its sovereign capacity as a regulator rather than as a market participant.  Id. at 1343.

We are not entirely persuaded by the reasoning in Western Oil and Gas;[4] however, even if we were to agree, this case is

---

[4]Regardless of our doubt about the reasoning in Western Oil & Gas, we agree with the result because the state was not actively engaged in the narrowly defined market of oil transportation and was for that reason not a market participant in that industry.

13

different.  This case does not concern an established business relationship between the state and a private party where the private party is raising a constitutional challenge to the state's unilateral change to the terms of the "contract."  Nor does this case involve parties who are forced to continue to deal with the state because of the permanency of their facilities.  Rather, it involves parties who are asserting they have a right to do business initially with the state, and the state determining that it does not want to do business with the parties.  As such, we believe the plaintiffs' and the dissent's reliance on <u>Western Oil & Gas</u> is misplaced.[5]  We further note that South Dakota's residency requirement for its own business does not preclude Chance Management from dealing with the various private gaming businesses in South Dakota.

Having considered the arguments presented on this issue, we hold that the state of South Dakota is acting as a market participant in the gaming market by operating the South Dakota Lottery.  Further, we hold that the state's business decision to require that a majority interest of any corporate video lottery machine operator be held by South Dakota residents is not subject to Commerce Clause restrictions.

### B.  Equal Protection Clause

Sanders and Chance Management also contend that the residency requirement violates their equal protection rights under the

---

[5]The dissent finds the state's recent increase of its share of the State Lottery revenue to be relevant to this case.  We respectfully disagree.  Our "activity-by-activity analysis," <u>see post</u> at 20, is confined to whether the state's decision on the residency requirement falls within the market participation exception.  Because neither Chance Management nor Sanders has challenged the state's decision to reap 50% of the revenue from its business (nor would they have standing to do so), we express no opinion on that issue.

14

Fourteenth Amendment.  The plaintiffs concede that rational basis review governs their equal protection challenge.  Under the rational basis standard, we presume legislation is valid and will sustain it if the classification drawn by the statute is rationally related to a legitimate state interest.  City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985).  The statutory classification "need not be drawn so as to fit with precision the legitimate purposes animating it."  Alexandria Scrap, 426 U.S. at 813.  Instead, the plaintiffs have the burden of proving that the classification is so attenuated to its asserted purpose that the distinction it draws is wholly arbitrary and irrational.  City of Cleburne, 473 U.S. at 446.  Moreover, a party challenging the legislation must negate "every conceivable basis which might support it."  FCC v. Beach Communications, Inc., 508 U.S. 307, 315 (1993) (internal quotations omitted).  The plaintiffs contend that the state has not submitted a legitimate purpose for the residency requirement, and further, that the residency requirement is not related to any legitimate purpose.

We find that the residency requirement is rationally related to legitimate interests averred by the state.  It is axiomatic that the state's first submitted interest, preventing illegal activities and infiltration by outside criminal elements into the South Dakota Lottery, is a legitimate purpose.  Furthermore, we agree with the district court that "[g]ambling is generally understood to have a greater tendency to attract criminal infiltration than most other types of business enterprises."  Chance Management, 876 F. Supp. at 212.  We note that in furtherance of its interest in protecting against the infiltration of criminal elements, South Dakota closely monitors the video lottery machine operators.  The state undertakes an extensive background investigation on each applicant.  Those investigations include contacts with foreign law enforcement bodies and sometimes require personal contact to conduct interviews and verify information.  (J.A. at 50-51.)  In addition, the state conducts periodic inspections of the operators' premises.  (J.A. at

15

51.)  While the state's use of a residency requirement to prevent criminal infiltration in its video lottery business may not be the perfect solution, a legislature could rationally conclude that the South Dakota Lottery can better protect the state's legitimate interests if the corporate operators of the machines -- who maintain the video machines and who collect and temporarily hold large sums of money from them -- are owned in major part by residents of South Dakota.

We also agree with the district court that the state has a legitimate interest in insuring that the state's substantial investment in its video lottery business ultimately benefits the South Dakota taxpayers.  The legislature could have rationally concluded that a residency requirement would further this interest. Cf. Smith Setzer & Sons, Inc. v. S. C. Procurement Review Panel, 20 F.3d 1311 (4th Cir. 1994) (holding statute was rationally related to state's legitimate interest in directing benefits generated by state purchases to the citizens of the state).

Accordingly, we hold that § 42-7A-43 of the South Dakota Codified Laws does not violate the Equal Protection Clause of the Fourteenth Amendment.

## C.  Privileges and Immunities Clause

In their final claim, appellants argue that South Dakota's residency requirement violates the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution, which states that "citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  The state responds that neither Chance Management nor Sanders has standing.  The state further argues that if we hold that Sanders has standing, he should lose on the merits, because the South Dakota residency requirement does not burden a fundamental privilege or immunity covered by the Privileges and Immunities

16

and because the state's interest in the profitability and the

We                                                                      d
Immunities Clause rea
has                                                                     e
Management                                                              ,
Chanc   Management cannot raise the Privileges and Immunities claim.
                                                       ization, 451 U.S. 648, 656
           Sanders, who has not applied individually for a license as an
           and whose only  "injury" is that flowing from his status as a
              of Chance Management, also lacks standing.  Smith Setzer
Sons, 20 F.2d at 1311.

           rs  attempts  to  distinguish  the  cases  holding  that  a
individual's status as a shareholder is
noting that § 42-7A-43 prohibits nonresident individuals, as well a
corporations                                                            r
licenses.                         individual applicants is not at
issue                                                                   n
operator's license.

      Sanders a                                                         e
applicant in this cas
the statutory requirements imposed by South Dakota Codified Laws § 42-7A-
    which provides for a background investigation and requires operators
   meet certain qualifications to obtain a license.  This argument i
unpersuasive because it does not address the material question -- whether
        has a cognizable injury under the Privileges and Immunities Clause
Regardless of the extra hurdles Sanders,
for Chance Management to obtain an operator's license, the

17

potential injury that denying the license to Chance Management may cause to Sanders flows directly and solely from the alleged injury to Chance Management, which is "not constitutionally cognizable under the Privileges and Immunities Clause." Smith Setzer & Sons, 20 F.3d at 1317. We therefore hold that neither Chance Management nor Sanders has standing to bring the Privileges and Immunities Clause claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

LAY, Circuit Judge, dissenting.

With all due respect, the fundamental flaw in the majority's reasoning is the manner in which it frames the issue. The majority asks whether the state of South Dakota, in exclusively favoring its residents in the operation of a video lottery business, is acting as a "market participant" or a "market regulator." Upon finding that the state is a market participant in the video lottery business (indeed, it operates a monopoly) on account of its substantial investment in a central computer, software, and related expenses, the court declares it immune from Commerce Clause restrictions.[6]

The difficulty with the majority's stated approach is that it fails to ask whether, while acting as a market participant, the state has also illegally attempted to regulate the market. As the

---

[6]The Commerce Clause restricts the states in discriminating against interstate commerce. Thus, the Supreme Court has generally recognized that the "'negative' aspect of the Commerce Clause prohibits economic protectionism--that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. v. Limbach, 486 U.S. 269, 273-74 (1988).

18

Circuit has explained, "[c]ourts must evaluate separately eac
challenged                                                      s
participation or regu          USA Recycling, Inc. v. Town of Babylon, 66
      1272, 1282 (2d Cir. 1995), cert. denied                  and cert.
denied 116 S. Ct. 1452 (1996).  Dissenting in _____, Justice Powell
        this truism when he observed that "[s]tate action burdening
            trade is no less state action because it is accomplished by a
        agency authorized to participate in the private market."  _____
Inc. v. Stake            451 (1980) (Powell, J., dissenting).  Thus,
the fact that a state may participate in the mar
does not m                                                              e
majorit   reduces the distinction between market regulation and market


    The majority principally relies on H_____,
426 U.S. 794, 810 (1976), and Reeves                                    e
cases, however, did t
in a policy of discrimination.  ___ Reeves, Inc. v. Kelley
737 (8th Cir. 1979) (noting the complete absence of an "allegation tha
South Dakota regulated or restricted out-of-state sale of privatel
manufactured cement or exercised its police power to suppress competition
                                ), aff'd                        [7]  More
_____

    Indeed, the Supreme court in _____ expressly distinguished
such cases in observing that:

    South Dakota has not sought to limit access to the
          limestone or other materials used to make cement
    Nor ha                                                   r
    sister                                                   .
    Moreover, petitioner has not s
    possesses                                                o
    produce cement.


    Likewise, the Court in Hughes upheld Maryland's subsidization
of     in-state automobile scrap metal processing market on the
                            cal effect" of the challenged scheme
"wa   that the movement of hulks in interstate commerce was
                                                    426 U.S.

19

importantly, <u>Wyoming v. Oklahoma</u>, 502 U.S. 437 (1992), directly refuted the majority's analysis.  There the Court struck down an Oklahoma statute which required all public and private utilities within the state to supply ten percent of their fuel needs from Oklahoma-mined coal.  While acknowledging that Oklahoma, <u>as a participant</u> in the coal market, could purchase coal from whomever it chose, <u>id.</u> at 461, the Court invalidated Oklahoma's regulatory conduct in imposing purchase requirements upon private utilities.  <u>Id.</u> at 454-59.[8]

In discussing <u>Wyoming v. Oklahoma</u>, the majority takes comfort in the Supreme Court's observation that were the Oklahoma law construed to apply only to the state-owned public utility (Grand River Dam Authority) (GRDA) the statute "would become a fundamentally different piece of legislation." <u>Ante</u> at 11 (citing <u>Wyoming v. Oklahoma</u>, 502 U.S. at 461).  If the law struck down in <u>Wyoming v. Oklahoma</u> were applied only to the GRDA, and the market participant exception were applied, private utilities would be free to make their own decisions from whom they might buy coal unimpeded by government regulation.  In contrast, because of the way South Dakota has structured and regulated the video lottery market, private companies are not free to do business unimpeded by government regulation, without facing criminal penalties.  Beyond

---

at 803 & n.13.  The Court distinguished prior cases involving "interfere[nce] with the natural functioning of the interstate market either through prohibition or through burdensome regulation," concluding that "Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur.  Instead, it has entered into the market itself to bid up their price."  <u>Id.</u> at 806.

[8]Because the Court found it impracticable to sever that portion of the statute governing state-owned utilities, it declared the Act as a whole unconstitutional.  <u>Id.</u> at 459-61.

choosing its own "business partners," South Dakota has regulated all actors in the video lottery market by prohibiting transactions between private parties.  Although South Dakota is participating in the market, its statutory commands reach beyond merely dictating terms to its "business partners," and therefore its regulation of the video lottery market is similar to the law struck down in <u>Wyoming v. Oklahoma</u>.

In contrast to the analysis urged by the majority, the decisions of several other circuits support an activity-by-activity analysis where the state both regulates and participates in the relevant market.  In <u>Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders</u>, for example, the Third Circuit observed:

> When a public entity participates in a market, it may sell and buy what it chooses, to or from whom it chooses, on terms of its choice; its market participation does not, however, confer upon it the right to use its regulatory power to control the actions of others in that market.

48 F.3d 701, 717 (3d Cir. 1995); <u>accord</u> <u>SSC Corp. v. Town of Smithtown</u>, 66 F.3d 502, 513 (2d Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 911 (1996).  The Second Circuit has likewise stated:

> [The Town of] Babylon has exercised its governmental powers by denying licenses to all garbage haulers but the one hired by the Town, and by establishing civil and criminal penalties for haulers who collect garbage without a license.  Because no private actor could engage in such activity, the Town is acting as a market regulator rather than a market participant.  The Town does 'participate' in the garbage collection market in a different respect:  it buys garbage hauling services from BSSCI.  But states and local governments do not enjoy <u>carte blanche</u> to regulate a market simply because they also participate in that market.  Particular state actions that do not constitute 'market participation' are subject to the limitations imposed by the Commerce Clause.  A state engaging in mercantile activity does not

obtain blanket immunity to regulate the market in which it participates, free from the strictures of the dormant Commerce Clause.

USA Recycling, 66 F.3d at 1282 (citations omitted).

Similarly, in Western Oil & Gas Ass'n v. Cory, 726 F.2d 1340 (9th Cir. 1984), aff'd without opinion by an equally divided court, 471 U.S. 81 (1985), the Ninth Circuit recognized that a state's ownership interest in a market does not exempt its regulation of the market from Commerce Clause scrutiny. Western Oil & Gas involved a California scheme to collect a volume-based "rent" from off-coast refineries for the leasing of state-owned tidelands over which they transported oil. The state contended that its leasehold activities fell outside the scope of the Commerce Clause on the basis that, as owner of the tidelands, it acted in a proprietary capacity in renting them. Id. at 1342. The court rejected that argument:

> The State owns and controls tidelands and submerged lands in its sovereign capacity. Although some of the lands are in the possession of local State entities or private interests, this does not mean that California becomes one of many competitors. The permanency of plaintiffs' facilities does not permit them to "shop around". There is no other competitor to which they can go for the rental of the required strip of California coastline. The Commission has a complete monopoly over the sites used by the oil companies. The companies have no choice but to renew their leases despite the volumetric rate, as the oil, gas and petroleum-derived products cannot be transported to plaintiffs' facilities without traversing the state-owned lands. This control over the channels of interstate commerce permits the State to erect substantial impediments to the free flow of commerce. We therefore reject the State's contention that its leasing activities are not subject to Commerce Clause scrutiny.

Id. at 1343 (emphasis added and citations omitted).

22

There    as no doubt in <u>Western Oil & Gas</u>                                         e tidelands                                                        their oil.  Yet the fact that it wielded monopolitistic power, and as such was a market participant, not deter the court from holding that its regulatory function wa subject to dormant Commerce Clause scrutiny.

The                                        <u>Western Oil & Gas</u> on the ground that the present case "does not involve parties who are <u>forced</u> to deal with the State in a monopoly situation that falls outside the reach of free market forces," but rather "parties who are asserting they have a <u>right</u> to do business initially with the State, and the state determining that it does not want to do business with the parties."    <u>Ante</u> at 14.    This characterization slights the fact that in deciding that it "does not want to do business" with Chance, the state has also foreclosed the opportunity for Chance "to do business" with anyone else, much as the refineries in <u>Western Oil & Gas</u> were foreclosed from dealing with other landowners.  If the   rationale   behind   market   participation   doctrine   is   genuinely evenhandedness, <u>see</u> <u>Reeves</u>, 447 U.S. at 439 (where "state proprietary activities" are "burdened with the same restrictions imposed on private market participants," then "[e]venhandedness" supports invocation of market participant doctrine), then it would seem that South Dakota must take the bitter with the sweet:  it may not enter the market as a purchaser of video lottery operation services while precluding, through the use of its regulatory power, all potential competitors from entering the market.[9]  If anything, the instant case presents facts more compelling than <u>Western Oil & Gas</u> for not applying the market participant exception, for the state has a monopoly over video lottery as a direct result of its

_____

At oral argument South Dakota conceded that, if the market participation exception does not apply, its interests in regulating

erely by "happenstance."[10] ___ _Reeves_
at        see ____ _C & A Carbone, Inc. v. Town of Clarkstown_          .
1677,        (1994) ("With respect to this stream of commerce, the flow
        ordinance discriminates, for it allows only the favored operator
process waste that is within the limits of the town."); ___ at 1683
        the flow control ordinance favors a single local proprietor . .


There should be little question in the present case that South Dakota
not simply exercising a private choice as to the parties with whom it
        Indeed, by its own constitutional and legislative enactments

---

[10]    oretically the refineries involved in _Western Oil & Ga_
_cou_ have dealt with other landowners; only the cost prohibited
        from so doing.  Here, by contrast, entry into the market i
not cost prohibitive, but constitutionally and statutoril
forbidden.

[1]                                                                  n
question                                                             e
monopoly                                                            a
state business within the gaming market," ____ at 7, and  adds that
                                                                oes not
preclu   Chance Management from dealing with the various private
                                    _Ante_ at 14.  These statements
        soften the fact that South Dakota made itself the only
  artner" with whom plaintiffs may enter the video lotter
business.  To suggest that the plaintiffs can merely go elsewhere
into other private gaming is a tacit admission that the state has
        the video lottery market, and seems to ignore the
  ority's own command that the court's inquiry is limited t
analyzing a narrowly defined market.

24

the state concedes that it is regulating the market.[12]  Pursuant to the constitutional grant of authority within

---

[12]Article III, § 25 of the South Dakota Constitution, for example, provides in relevant part:

> The Legislature shall not authorize any game of chance lottery, or gift enterprise, under any pretense, or for any purpose whatever . . . .  However, it shall be lawful for the Legislature to authorize by law a state lottery or video games of chance, or both, <u>which are regulated by the state of South Dakota</u>, either separately by the state or jointly with one or more states, <u>and which are owned and operated by the state of South Dakota</u>, either separately by the state or jointly with one or more states or persons, provided any such video games of chance shall not directly dispense coins or tokens. However, the Legislature shall not expand the statutory authority existing as of June 1, 1994, regarding any private ownership of state lottery games or video games of chance, or both.  The Legislature shall establish the portion of proceeds due the state from such lottery or video games of chance, or both, and the purposes for which those proceeds are to be used.  SDCL 42-7A, and its amendments, regulations, and related laws, and all acts and contracts relying for authority upon such laws and regulations, beginning July 1, 1987, to the effective date of this amendment, are ratified and approved.

Section 25, the South Dakota legislature has del

Lottery                                                                        n

of        y] games."   S.D. Codified Laws Ann. § 42-7A-2 (Michie Supp.

        Likewise, § 42-7A-21 authorizes the Commission to promulgate

    ules and regulations" concerning seventeen aspects of the lottery

including                                                                      e

amount of application fees to be paid," _id._                                  g

proce        _id._ § 42-7A-21(16).   As South Dakota admits in its brief:
"The State's involvement in video lottery is pervasive.   Virtually every
aspect  of  video  lottery  operations  is  owned,  operated,  specified,
controlled or monitored by the State."   Brief for Appellees at 12.


        Although the majority asserts that South Dakota "is free to choose
those with whom it will deal, be it through licensure or contract," _ante_
at 13, the granting and denial of licenses is far more akin to market
regulation than to market participation.   Public licensure is not generally
contractual in nature: a license neither grants the licensee a property
right nor creates a mutual

obligation.[13]   If anything, public licensing constitutes a "primeval governmental activity" such as the taxation scheme favoring in-state residents found to fall outside of the market participant exception in <u>Limbach</u>, 486 U.S. at 277.

The state concedes that licensing <u>normally</u> entails authorizing private "individuals to pursue private occupations that demand a minimum

---

[13]One authority defines "license" (in part):

> A permit, granted by an appropriate governmental body, generally for a consideration, to a person, firm, or corporation . . . to carry on some business subject to regulation under the police power.  A license is not a contract between the state and the licensee, but is a mere personal permit.  Neither is it property or a property right.

Black's Law Dictionary 829 (5th ed. 1979) (citations omitted).  The final phrase in the quoted passage is helpful in light of the public policy declaration found in S.D. Codified Laws Ann. § 42-7A-56(3) (Michie Supp. 1995):

> No applicant for a license or other affirmative commission action has any right to a license or to the granting of the approval sought.  Any license issued or other commission approval granted pursuant to the provisions of this chapter is a revocable privilege, and no holder acquires any vested interest or property right therein or thereunder.

Accordingly, this section too suggests the state's licensing scheme is regulatory, not proprietary, in nature, for a contract creates bargained for rights and obligations. <u>Compare</u>, <u>e.g.</u>, <u>Rushmore State Bank v. Kurylas, Inc.</u>, 424 N.W.2d 649, 653 (S.D. 1988) (noting that "there are property rights in the [liquor] license as between the licensee and third parties such as creditors," but "there clearly is no general property right in the license in South Dakota as between the state and the licensee") <u>with</u> Black's Law Dictionary at 291-92 (5th ed. 1979) (defining "contract" (in part) as "[a]n agreement between two or more persons which creates an obligation to do or not to do a particular thing.  Its essentials are competent parties, subject matter, a legal consideration, mutuality of agreement, and mutuality of obligation.").

level of proficiency, skill and competency," but contends that its lottery licensing regime merely "provides the individual

or business with the ability to participate in the State's video lottery business enterprise." Brief for Appellees at 16. This assertion (which is unsupported by any authority) is dubious, given the substantial eligibility requirements delineated in S.D. Codified Laws Ann. §§ 42-7A-13 and 42-7A-14 (Michie Supp. 1995). The granting and denial of public licenses clearly constitutes market regulation. See Reeves, 447 U.S. at 440; cf. Richard A. Epstein, The Permit Power Meets the Constitution, 81 Iowa L. Rev. 407, 414 (1995) (["N]o matter how generous a view one takes of the permit power, one still must distinguish between the state as regulator and the state as owner. Quite bluntly, the power to issue a permit does not--or at least should not--make the state a part owner of the property.").

The state's unilateral decision to increase its share of video lottery revenues from 35 to 50 percent also detracts from its argument that it is not regulating the video lottery market. See S.D. Codified Laws Ann. § 42-7A-63 (Michie Supp. 1995). In a competitive market, such an increase in a licensor's share of revenues would normally be the product of bilateral negotiations in which the possibility of losing the licensee to a competitor would serve to limit the licensor's bargaining power. Here, however, the state has no competitors, for it has erected a legal barrier to their entry into the video lottery market. Private entities enjoy no such comparable power. See SSC Corp., 66 F.3d at 512 ("A state's actions constitute 'market participation' only if a private party could have engaged in the same actions."). Characterizing the state's activity as a "refusal to deal" with nonresident corporations is therefore misleading. Compare United States v. Colgate & Co., 250 U.S. 300, 307 (1919) ("In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.") with Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359,

29

375 (1927) (finding refusal to deal "in pursuance of a purpose to monopolize" illegal under the Sherman Act). Cf. Epstein, supra at 416 ("In ordinary markets, if you don't like the terms that people offer, you can go elsewhere. But there is no effective exit right when the state asserts its permit power. The state, which has a stranglehold on individual behavior, must be told to relax its grip." (footnote omitted)).

To be sure, South Dakota "participates" at some level in the video lottery market each time it "contracts" with a state-licensed video lottery operator, and the majority is quite correct to reject Chance's argument that the market participant doctrine is limited to circumstances in which a state formally acts as a buyer, seller, or employer.[14] Under South Dakota's licensing scheme, however, only corporations owned in their majority by residents are permitted to enter the video lottery market; nonresident-owned corporations are "removed from the market altogether," Reeves, 447 U.S. at 444 n.17, for one may not operate a video lottery machine without a license, and doing so is in fact punishable as a felony. See S.D. Codified Laws Ann. § 42-7A-39 (1991). Imposing criminal penalties may not fairly be considered an act of a market participant. See SSC Corp., 66 F.3d at 512. Pursuant to its state

---

[14]See South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 97 (1984) (plurality opinion) ("privity of contract is not always the outer boundary of permissible state activity"); White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 211 n.7 (1983) ("[T]he Commerce Clause does not require the city to stop at the boundary of formal privity of contract."); Reeves, 447 U.S. at 438 n.10 (noting that "States may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal"); Reeves, 603 F.2d at 737 n.1 (a state possesses "'unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases'" (quoting Perkins v. Lukens Steel Co., 310 U.S. 113, 127 (1940)), aff'd, 447 U.S. 429 (1980); Independent Charities of Am., Inc. v. Minnesota, 82 F.3d 791, 799 (8th Cir. 1996) (finding "no well-founded reason to constrict the proprietary activities covered by the market participant exception to acts of buying or selling").

30

constitution, South Dakota is the _____ "purchaser" of video lottery

in which Chance might sell

its services, nor is there any residual purchase                    See

S.D. Const. Art. III,

of . . . lottery . . . .").[15]

of the hallmarks of p

to characterize its video lottery arrangement

See  nnicke, 467 U.S. at 97 (plurality opinion) (market participan

doctrine                                                        e

imposes it upon someone with whom it is in contractual privity").


            scheme set out by the South Dakota legislature, it should

be obvious that the state is using its police po

lottery in a manner that precludes

entrepreneur.                                                    ]

impeding free private trade in the national marketplace."  Reeves      .

at        nfortunately, Chance has no opportunity to compete on equal


     I must, therefore, respectfully dissent.

---

15                                                              e

                                                          titors,

but    mpletely foreclosed market.  See Reeves, 447 U.S. at 44
n.17 ("The 'bottom line' of the scheme closely parallels the result
   Alexandria  Scrap                                            t
remove  from the market altogether; to compete successfully with
         competitors,  however,  they  must  achieve  additional

to                                                              n
market behavior to in-state concrete suppliers.").

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.