**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1621

CHRIS BRUSZNICKI; THORNTON MELLON, LLC; GEOFFREY POLK,

Plaintiffs - Appellants,

and

PARADISE POINT, LLC,

Plaintiff,

v.

PRINCE GEORGE'S COUNTY; BRIAN E. FROSH, Attorney General for the State of Maryland,

Defendants – Appellees,

and

STEPHEN J. MCGIBBON, Acting Director Collector of Taxes,

Defendant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Peter J. Messitte, Senior District Judge. (8:19-cv-01035-PJM)

Argued: March 8, 2022                                  Decided: August 2, 2022

Before AGEE and RICHARDSON, Circuit Judges, and FLOYD, Senior Circuit Judge.

Reversed and remanded with instructions by published opinion.   Senior Judge Floyd wrote the opinion in which Judge Agee and Judge Richardson joined.

———————————

**ARGUED:**  N. Tucker Meneely, COUNCIL, BARADEL, KOSMERL & NOLAN, P.A., Annapolis, Maryland, for Appellants.  Justin E. Fine, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Brian T. Gallagher, COUNCIL, BARADEL, KOSMERL & NOLAN, P.A., Annapolis, Maryland, for Appellants.  Brian E. Frosh, Attorney General, Adam D. Snyder, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

———————————

FLOYD, Senior Circuit Judge:

Plaintiffs Geoffrey Polk, Chris Brusznicki, and Thornton Mellon, LLC are "in the business of purchasing tax-lien certificates." Pls.' Opening Br. 2. They attend government auctions where they bid on tax-delinquent properties and, if successful, either take title to the properties or earn interest while the owners try to redeem them. A Maryland statute has made that endeavor difficult in Prince George's County. The problem: the statute directs the County to offer defaulted properties to a select class of people (comprising largely those living and holding government positions there) before listing the properties for regular public auction. Plaintiffs, who do not fit that limited class, claim the statute violates the Privileges and Immunities Clause of the U.S. Constitution. Because it tramples on fundamental rights to own property and pursue a chosen profession without advancing any substantial state interests, we agree and reverse the district court.

I.

Like most States, Maryland considers unpaid real-property taxes to constitute a lien against the property and permits local authorities to auction to the public the right to enforce those liens as a way of recovering the monies owed. Unlike most States, however, Maryland requires Prince George's County to first hold a "limited auction" open only to several enumerated categories of people. Md. Code Ann., Tax-Prop. § 14-817(d)(3). In 2017, when this Tax-Property statute was enacted, those categories included: Prince George's residents, persons employed by the County government, persons employed by a municipal government in the County, veterans (without further qualification), and federal

3

employees (also without qualification). *Id.* To prevent an end-run around these restrictions, Maryland also prohibits successful bidders from transferring their titles. *Id.* § 14-821(b). Remaining properties then proceed to a general auction, where anyone can bid. And unlike the limited-auction winners, their general-auction counterparts may freely assign their interests. *Id.* § 14-821(a).

Aside from this limited auction, Prince George's tax sales are nothing out of the ordinary. The auction winner receives a lien certificate. For occupied dwellings, owners then have six months to redeem their properties before the lien-certificate holder may legally foreclose and obtain a deed. But to succeed, owners must pay several different fees and penalties, including a special redemption rate assessed by each county. Prince George's sets its rate at 20%, making its tax-sales auction an attractive "investment opportunity." *See* Att'y Gen.'s Resp. Br. 3–4. In that way, many bidders use their tax-lien certificates not to secure ownership over the properties but to earn the interest the owners will pay. *See id.* This process runs similarly for "vacant" lots and properties "unfit for habitation," except that lien-certificate holders may—though they do not have to—initiate foreclosure proceedings on such properties immediately, without waiting the six months. Md. Code Ann., Tax-Prop. § 14-833(h).

Plaintiffs Polk, Brusznicki, and Thornton Mellon, LLC allege the limited-auction regime has pinioned their property and business opportunities. Polk, who resides in Illinois, claims the County has repeatedly refused him participation in the limited auctions, depriving him of an opportunity to bid on properties already bought up at those auctions and forcing him to pay more for left-over properties than the privileged classes had paid at

the artificially bridled limited auctions. And Brusznicki, though he has been able to participate in the limited auctions under the veteran exception despite also living in Illinois, challenges § 14-821(b)'s provision banning him from assigning his lien certificates to Thornton Mellon.

Believing these burdens violate the Privileges and Immunities Clause, Plaintiffs brought this action against Prince George's in Maryland's state court. The County removed to federal court, and Plaintiffs amended their complaint to add Maryland's Attorney General. The Attorney General and Plaintiffs then cross-moved for summary judgment, with the County taking no position on the statute's constitutionality. Plaintiffs sought declaratory and injunctive relief preventing the Attorney General and the County from enforcing the statute. The Attorney General requested the court to uphold the statute's constitutionality in full. And both sides accepted the basic facts giving rise to the suit.

The district court granted each motion in part. It held the Privileges and Immunities Clause "clear[ly]" applied because the statute curtailed "the ability of nonresidents to engage in the fundamental right of acquiring property within the state." *Paradise Point, LLC v. Prince George's Cnty.*, 540 F. Supp. 3d 524, 530 (D. Md. 2021). But it also recognized a "compelling" County interest in "community-revitalization": improving neighborhoods, promoting homeownership, and reducing the blight vacant and abandoned properties cause. *Id.* It thus accepted that certain protectionist measures may be appropriate in principle, so long as "the discrimination practiced against nonresidents bears a substantially close relationship to the reason proffered by the State." *Id.* at 531. But the two provisions permitting veterans and federal employees to bid in the auction no matter

5

where they live or work troubled the court. It believed them too far removed from any legitimate state interest "because those classes purportedly do not share the same incentives to pursue community revitalization goals." *Id.* at 531. So the court severed those two provisions, but otherwise left the Tax-Property statute, § 14-817(d), intact. *Id.* at 533.[1]

Ten days after the district court issued its judgment, Maryland reinserted the veteran and federal-employee provisions, albeit capping them only to veterans and federal employees who work in the County. Md. Code Ann., Tax-Prop. § 14-817(d)(3). It also narrowed the scope of the limited auction to vacant and uninhabitable properties, opening all other properties to general-public bidding. *Id.* § 14-817(d)(2).

Plaintiffs now appeal the district court's summary judgment. We review de novo, "applying the same legal standards as the district court and viewing all facts in the light most favorable to the nonmoving party." *W.C. English, Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 402–03 (4th Cir. 2019) (citation omitted). And we consider the judgment "in light of the [ ] statute as it now stands, not as it once did." *Hall v. Beals*, 396 U.S. 45, 48 (1969).

II.

Before we can dive into the merits of Plaintiffs' Privileges and Immunities claim, we must address the Attorney General's argument that Maryland's amendments to the Tax-

---

[1] Another company, Paradise Point, filed a separate challenge directly in the district court. The court consolidated the two lawsuits but ultimately ruled that, as a corporation, Paradise Point had no Privileges and Immunities claim. *Paradise Point*, 540 F. Supp. 3d at 529. Paradise Point does not appeal that decision.

Property statute—limiting the auction to properties unfit for habitation and permitting only those veterans and federal employees who work in the County to participate—have mooted Plaintiffs' claims.  The district court has not had an opportunity to rule on this argument because it entered its order before Maryland amended the statute.  But mootness raises a question of law, *Green v. City of Raleigh*, 523 F.3d 293, 298 (4th Cir. 2008), and its resolution here is rather straightforward, so we see no need to remand.

In this Court, as in all others, an action becomes moot when it "los[es] its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 198 (4th Cir. 1997) (citation omitted).  This inquiry applies to all changed circumstances— nothing about a statutory amendment per se moots a case.  Instead, a legislative amendment will moot a challenge only when it "significantly alters the posture of th[e] case." *U.S. Dep't of Treasury v. Galioto*, 477 U.S. 556, 559 (1986).  But where, "as now written," a statute continues to abridge plaintiffs' rights, litigation may press on.  *United Bldg. & Constr. Trades Council of Camden Cnty. & Vicinity v. Mayor & Council of Camden*, 465 U.S. 208, 214 (1984); *cf. Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 661 n.1 (1989) (considering "the HHS Regulations to the extent they supplement or displace the Commissioner's original directive").

Here, neither amendment destroyed the basis for Plaintiffs' claims.  True, Plaintiffs now stand on the same footing as County residents with respect to well-maintained properties, but they remain disadvantaged when it comes to vacant, uninhabitable ones. The Attorney General paints that disadvantage as slight because "inhabited properties . . .

7

provide the greatest investment opportunities." Att'y Gen.'s Resp. Br. 15 n.3. But Plaintiffs never limited their Complaint to the most lucrative properties. And beyond mere investment, Plaintiffs have a fundamental right to own property anywhere in the United States, habitable or not. *See Paul v. Virginia*, 75 U.S. 168, 180 (1868) (expounding fundamental rights the Privileges and Immunities Clause protects), *overruled on other grounds by United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533 (1944). As for the veteran and federal-employee amendment, it *truncated* Plaintiffs' rights further rather than expand them. If previously, Maryland only prohibited Brusznicki (the honorably discharged veteran living in Illinois) from transferring the lien certificates, it now prevents him from participating at all.

The Attorney General also urges that, conceptually, there can be "no live controversy" where plaintiffs mount "an as applied challenge to the superseded law." *See* Att'y Gen.'s Resp. Br. 12 (citing *Jordahl*, 122 F.3d at 198). First off, *Jordahl* does not stand for any such categorical rule. We did not dismiss that case because the plaintiff raised an as-applied challenge but because no "actual or threatened" harm persisted after the amendment. 122 F.3d at 198. And all the same, Plaintiffs challenge the Tax-Property statute on its face, not as applied. *See, e.g.*, J.A. 353–54 (asking, in the amended complaint, to "declar[e] the MD Tax Property 14-817 list of 'eligible participants' unconstitutional and in violation of the privileges and immunities clause of the 14th Amendment" and requesting corresponding "injunctive relief"); *id.* at 127 (explaining, on motion for summary judgment, that the "proper and just relief in this case is an order declaring the Limited Auction statute unconstitutional"). Perhaps even more importantly, the district

8

court offered a facial remedy, striking the federal-employee and veteran provisions from the statute. *Paradise Point*, 540 F. Supp. 3d at 533. And where the district court "address[es] the facial validity" of the statute, we can pass on it, as well. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 330 (2010). In short, a live controversy remains.[2]

### III.

Article IV's Privileges and Immunities Clause entitles "[t]he Citizens of each State . . . to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The Clause serves to "constitute the citizens of the United States one people, by placing the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296 (1998) (cleaned up) (quoting *Paul*, 75 U.S. at 180). Its "protections are not absolute," but the Clause has always proscribed "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Saenz v. Roe*, 526 U.S. 489, 502 (1999) (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)). And more recently, in *Camden*, the Supreme Court extended the Clause's reach to prohibit

---

[2] The Attorney General also argues that Thornton Mellon, LLC lacks standing to bring a claim under the Privileges and Immunities Clause. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas,* 139 S. Ct. 2449, 2460–61 (2019) (reiterating that "the Privileges and Immunities Clause has been interpreted not to protect corporations"). We decline to resolve this issue because "we have at least one individual plaintiff who has demonstrated standing," allowing the claim to proceed. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262 (1977); *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 209 (4th Cir. 2020).

municipal- or county-residence requirements that exclude citizens of other States. 465 U.S. at 215–18.

A two-step inquiry determines when a residency classification offends Privileges and Immunities protections. At the threshold, "the activity in question must be sufficiently basic to the livelihood of the Nation" so "as to fall within the purview of the Privileges and Immunities Clause." *Supreme Ct. of Va. v. Friedman*, 487 U.S. 59, 64 (1988) (cleaned up) (citation omitted). But even if it is, courts "will invalidate it only if [they] conclude that the restriction is not closely related to the advancement of a substantial state [or county] interest." *Id.* at 65.

The Attorney General contends the Tax-Property statute passes both tests: it does not implicate any fundamental rights and even if it does, the County has appropriately favored its own residents and employees to revive the community. Alternatively, the Attorney General urges us to think of lien-certificate sales as a uniquely governmental activity comparable to state purchases of goods and services and exempt them from the Clause altogether. We cannot agree with any of those arguments. The Tax-Property statute betrays a paradigmatic protectionist impulse designed to benefit County residents at the expense of outsiders rather than advance any legitimate state interest. And even if a special exemption could be made for government activities—a possibility *Camden* all but forecloses—the statute here does not regulate any government activity; it applies to private parties seeking to purchase property, nothing more.

10

A.

Beginning at step one, the Privileges and Immunities Clause does not "specify[ ] the particular subjects as to which citizens of one State coming within the jurisdiction of another are guaranteed equality of treatment." *Austin v. New Hampshire*, 420 U.S. 656, 660 (1975). And as the Attorney General correctly points out, the Supreme Court has clarified the Clause protects a much narrower range of activity than other constitutional provisions—those "bearing upon the vitality of the Nation as a single entity." *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 383 (1978). But from the earliest cases applying the Clause, courts have recognized it "insures to [nonresidents] in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property." *Paul*, 75 U.S. at 180. The Tax-Property statute bars nonresidents who are not employed by the County—that is, hundreds of millions of Americans—from purchasing property at the County's limited auction. That bar is categorical, direct, and absolute. Maryland even prohibits assignment of the lien certificates on the back end. Md. Code Ann., Tax-Prop. § 14-821(b). Even the most generous understanding of the Privileges and Immunities Clause thus compels the conclusion that the statute abridges a fundamental right.

Still, the Attorney General argues the statute regulates tax-lien *certificates*, not real property. A certificate, he urges, "merely conveys a first position lien against the property and entitles the purchaser to foreclose the right of redemption *if* the property owner fails to pay the amounts necessary to redeem the property from tax sale." Att'y Gen.'s Resp. Br. 24 (cleaned up) (citation omitted). But that description no longer applies to the statute as

11

amended.   Recall that Maryland has limited the auction to vacant and uninhabitable properties only, and a lien certificate holder for those properties may initiate foreclosure proceedings "at any time after the date of sale."  *See* Md. Code Ann., Tax-Prop. § 14-833(h).  And besides, courts have always envisioned a broad right to own property for purposes of the Privileges and Immunities Clause.  *Baldwin*, for example, interpreted the Clause "to prevent a State from imposing *unreasonable burdens* on . . . the ownership and disposition of privately held property."  436 U.S. at 383 (emphasis added).  *McBurney v. Young* intimated that a "State might well run afoul of the Privileges and Immunities Clause" if it "prevent[s] out-of-state citizens from accessing records—like title documents and mortgage records—that are necessary to the transfer of property."  569 U.S. 221, 229 (2013).  And perhaps most importantly, *Corfield v. Coryell*, which courts find instructive to this day, resolved the Clause protects "either real or personal" property, meaning the lien certificates themselves would qualify.  6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823) (No. 3,230).

But if that is not enough, the right to own property intertwines here with another of Plaintiffs' fundamental rights, to "ply their trade, practice their occupation, [and] pursue a common calling."  *Hicklin v. Orbeck*, 437 U.S. 518, 524 (1978).  Plaintiffs wish to purchase property largely for commercial ends.  As they explain, they can earn a return in one of two ways: they can wait for the owner to redeem the property, collecting interest on the lien, or they can foreclose the right of redemption, take title to the property, and improve it to lease or to re-sell.  Pls.' Opening Br. 15.  The Attorney General appears to agree with that description, referring to Plaintiffs as "Investors" throughout the brief.  *See, e.g.*, Att'y Gen.'s Resp. Br. at 33 (contending Plaintiffs, as "investors[,] see the process as an

12

investment opportunity to collect from County residents above-market interest rates on the tax liens that they purchase"). But he argues the Tax-Property statute does not burden their occupations severely enough to trigger Privileges and Immunities protections.

As with the right to own property, courts have conceptualized the right to a common calling quite broadly, as well, finding a Privileges and Immunities violation whenever a State prevents noncitizens from conducting business "on terms of substantial equality with the citizens of that State." *Friedman*, 487 U.S. at 65 (quoting *Piper*, 470 U.S. at 280). In *Friedman*, for example, Virginia permitted resident attorneys who already practiced in other States to request admission to the bar on motion but required nonresident attorneys with the same credentials to take an exam. *Id.* at 61–62. Virginia, like the Attorney General here, sought to minimize the burden on nonresidents, arguing the examination offered "an adequate, alternative means of gaining admission to the bar." *Id.* at 65 (citation omitted). But the Court concluded the Clause applied even where "a State's discrimination against nonresidents . . . does not result in their total exclusion from the State." *Id.* It pointed to long-accepted cases like *Toomer*, 334 U.S. at 389, 396–99, where the Court invalidated a statute that charged nonresident fishermen a license fee 100 times the residents' fee, and *Hicklin*, 437 U.S. at 520, 524–31, where the Court prohibited Alaska from hiring residents ahead of others in positions related to the development of the State's oil and gas resources. So we ask only "whether the State has burdened the right to practice" a chosen profession "solely on the basis of citizenship or residency." *Friedman*, 487 U.S. at 67. We have no doubt it has. The record demonstrates that "the average bid amount for properties purchased during the [prior incarnation of the] limited auction is almost 1/3 the values of

13

the average bid amount for properties during the regular auction," J.A. 48—not to mention the Tax-Property statute entirely precludes non-residents from bidding on properties residents take off the market at the limited auction.

In response, the Attorney General holds out *McBurney v. Young*, 667 F.3d 454 (4th Cir. 2012), *aff'd*, 569 U.S. 221 (2013), arguing this more recent decision requires a closer nexus between Plaintiffs' trade and the prohibited activity. No dice. In *McBurney*, we examined a statute that prohibited nonresidents from reviewing Virginia's public records under its Freedom of Information Act (VFOIA). *See id.* at 459. One of the plaintiffs argued VFOIA abridged "his right to pursue a common calling because it prevent[ed] him from using his primary means of acquiring government records," a key component of his business. *Id.* at 463. We saw the matter differently because VFOIA did "not regulate anyone's qualifications or prerequisites to enter into or engage in any profession or trade" and did not "establish a license, fee, or other burden to . . . engaging in a profession." *Id.* at 464. On its face, we reasoned, the statute's "purpose and language" were entirely "unrelated to engaging in a particular profession." *Id.* And in practice, too, "multiple thousands of VFOIA requests" submitted annually bore no relationship to any trade. *Id.* We accordingly characterized VFOIA as having only "an indirect and tangential" effect on professional occupations overall. *Id.* at 465. Nor, as a factual matter, did VFOIA intolerably burden the individual plaintiff before the Court: it limited just one "method" by which he "conduct[ed] some of his business." *Id.* at 464. Put together, all of these considerations indicated to us "something inherently and qualitatively different about the VFOIA as compared to any of the provisions considered by the Supreme Court in the

14

context of Privileges and Immunities Clause's right to pursue a common calling"—provisions, which "directly" restrict or regulate commercial activity. *Id.*

When the Supreme Court took up *McBurney*, it placed its finger right on that difference. VFOIA, it said, was not "enacted for the protectionist purposes of burdening out-of-state citizens" but to "ensure the people of the Commonwealth ready access to public records in the custody of a public body or its officers and employees," "a distinctly nonprotectionist aim." 569 U.S. at 227–28 (cleaned up) (citation omitted). It merely "recognize[d] that Virginia taxpayers foot the bill for the fixed costs underlying recordkeeping in the Commonwealth" and declined to extend the fruit of that expense to nonresidents. *Id.* at 228.

This is not that case. Where VFOIA applied to all aspects of people's lives—indeed, another plaintiff in that case complained it unconstitutionally prevented him from obtaining child-support documents—the purpose of the Tax-Property statute *is* to regulate commercial activity, to direct who can buy tax certificates and when. There is nothing incidental or surprising about its effects on business. And those effects are far from innocuous. Rather than foreclosing just "one method" by which Plaintiffs practice their trade, *McBurney*, 667 F.3d at 465, the statute point-blank prevents Plaintiffs from bidding on property that Prince George's residents buy up at the limited auction. And the subdued competition at the limited auction allows the County's residents to purchase property at reduced rates. That is the definition of protectionism.

What *McBurney* teaches, in the end, is that the Privileges and Immunities Clause "does not require that a State tailor its every action to avoid any incidental effect on out-

15

of-state tradesmen." 569 U.S. at 229. But nothing in the Supreme Court or this Court's jurisprudence has ever permitted a State to "intentionally giv[e] its own citizens a competitive advantage in business or employment." *Id.* *McBurney* did not change that. And our decision today closely tracks the well-established ones discussed above, invalidating licensing schemes that charge nonresidents discriminatory rates or require nonresidents to pass additional tests. *E.g.*, *Friedman*, 487 U.S. at 66; *Hicklin*, 437 U.S. at 524–31; *Toomer*, 334 U.S. at 396–99; *see also Ward v. Maryland*, 12 Wall. 418, 432 (1871).

More generally, we cannot accept the Attorney General's attempt to elevate the initial question of whether a statute burdens a fundamental right above its station. The point of this threshold determination has always been simply to ascertain whether the right being abridged is of the type the Privileges and Immunities Clause means to protect. So, in *McBurney*, we rejected arguments that VFOIA infringed on "equal access to information," the "ability to pursue . . . economic interests," and the "ability to advocate for . . . political interests" as outside the limited categories of "rights the Supreme Court has previously identified as protected by the Privileges and Immunities Clause." 667 F.3d at 463 (cleaned up); *see also McBurney*, 569 U.S. at 233 (explaining that no broad right to access all public information "was recognized at common law"). But when a statute plainly implicates one of the rights at the core of the Clause—to own property, pursue a common calling, or access the courts, 667 F.3d at 463—the real work must be done at the second step, by "evaluating whether the statute's discrimination against noncitizens violates the Clause." *Camden*, 465 U.S. at 221 (citation omitted).

16

That is why, in *Camden*, the Court rejected defendants' efforts to place a public-employment statute "completely beyond the Clause." *Id.* (citation omitted). "A determination of whether a privilege is 'fundamental' for purposes of th[e] Clause," it instructed, "does not depend on whether the employees of private contractors and subcontractors engaged in public works projects can or cannot be said to be 'working for the city.' " *Id.* The public-works aspect, while "certainly a factor—perhaps [even] the crucial factor," bears only on the second, sufficient-relationship prong. *Id.* So it is here. If the Tax-Property statute effects only a negligible burden on nonresidents, especially as compared to other benefits it affords, the Attorney General may certainly point that out when explaining why the discrimination does not violate the Clause. But such defenses cannot retcon away the fundamental nature of the right at stake. And we must proceed to the second step of our analysis.

B.

Even where a statute abridges fundamental rights, the Privileges and Immunities Clause "does not preclude disparity in treatment where substantial reasons exist for the discrimination and the degree of discrimination bears a close relation to such reasons." *Friedman*, 487 U.S. at 67. The State bears the "burden" to demonstrate both the interest and the relation. *See Hicklin*, 437 U.S. at 536 (citation omitted).

The Attorney General argues the County has a compelling goal in refurbishing the neighborhoods, promoting homeownership, and reducing blight. Even assuming those constitute appropriate state goals, meeting them does not require excluding nonresidents.

17

Start with improving neighborhoods and reducing blight. Neither logic nor the record offers any reason to believe nonresidents would do a worse job revitalizing vacant properties than County residents or employees. The Attorney General provides no evidence, for example, that homes purchased by nonresidents remain abandoned for longer than homes purchased by residents. Quite the opposite, opening up the auction to more bidders may allow those with the most funds to purchase the properties, potentially accomplishing the County's goal much faster. The Attorney General himself admits, in a move we believe gives the game away, that "out-of-area tax-sale investors do not necessarily cause these evils, and in some respects can be regarded as performing a public service." Att'y Gen.'s Resp. Br. 33 (cleaned up) (citation omitted). That leaves us with exactly the kinds of arguments the Supreme Court rejected many times before. *See, e.g.*, *Friedman*, 487 U.S. at 67–68 (repudiating Virginia's unsupported assertion that non-resident lawyers have less commitment to and familiarity with Virginia law absent concrete evidence in the record); *Toomer*, 334 U.S. at 398 (striking down South Carolina's statute that discriminated against nonresident shrimp fishermen in part because the record failed to demonstrate their fishing techniques harmed the State more than the residents' practices).

Even granting the Attorney General's premise—that residents build back faster—the County can achieve its revitalization goals by employing "alternative means" that do not give rise to constitutional concerns. *Friedman*, 487 U.S. at 67 (citing *Piper*, 470 U.S. at 284). Consider again *Friedman*, where Virginia argued the bar examination would ensure nonresident attorneys have "a stake" in their "professional licensure and a

18

concomitant interest in the integrity and standards of the bar." *Id.* at 68. The Court reasoned the same goal could be achieved by requiring all attorneys seeking admission on motion to "maintain an office and a regular practice in the State" or attend "periodic continuing legal education courses." *Id.* at 69. Here, too, constitutional alternatives were readily available to the State. It could require purchasers who bid on uninhabited properties to first submit a renovation plan. It could impose a renovation timeline. It could even demand bidders to occupy the property themselves—a provision Maryland considered but abandoned when drafting the Tax-Property statute. *See* J.A. 74 n.2. Such requirements would more directly abate the blight without discriminating against nonresidents.

The same goes for promoting homeownership. The Attorney General provided no figures showing the County has a large population experiencing homelessness or that its property values are so high that people who work in the County cannot afford to live there. But even if such evidence existed, it would not suffice to enact protectionist measures unless the Attorney General could demonstrate that "non-citizens constitute a peculiar source of th[at] evil." *Hicklin*, 437 U.S. at 525 (quoting *Toomer*, 334 U.S. at 398). Faced with an analogous claim about resident unemployment, after all, the Supreme Court struck down Alaska's protectionist hiring statute because "no showing was made on this record that nonresidents were a peculiar source of" high resident unemployment; rather the record indicated "that a substantial number of Alaska's jobless residents . . . were unable to secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities." *Id.* at 526–27 (cleaned up). Just so here.

19

Absent some evidence that nonresidents take homeownership opportunities away from County residents or employees, the protectionist remedy cannot stand.

Finally, the text of the Tax-Property statute itself belies any claims of a substantial relationship between community revitalization and exclusion of nonresidents. The statute, as amended, opens the limited auction to all County residents but only to some County employees: veterans and persons working for the federal, County, and municipal governments. But what of private employees? Why exclude them if Maryland wishes to offer all persons an opportunity to live where they work? Why not instead open the limited auction to all County employees who earn less than some threshold amount? And what reason is there to believe that private employees would be less motivated to eradicate blight? These unanswered (and unanswerable) questions demonstrate plainly Maryland's protectionist aim. No substantial reasons justify this favoritism, and we must hold the statute unconstitutional.

## C.

In the alternative, the Attorney General contends that lien-certificate sales implicate uniquely governmental activity comparable to a State purchasing goods or services—activities, he claims, courts have exempted from Privileges and Immunities' reach. He proffers two cases in support, *Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265 (3d Cir. 1994), and *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311 (4th Cir. 1994).

20

At the outset, we must correct the Attorney General's articulation of *Smith Setzer.* That case dismissed a Privileges and Immunities claim because the plaintiff did not have standing to advance it; it made no merits determinations whatever under the Clause. 20 F.3d at 1317. And while it affirmed the program under the Commerce and the Equal Protection Clauses, those analyses do not "transfer mechanically" into the Privileges and Immunities context. *Camden*, 465 U.S. at 219. As *Camden* explained, the Commerce Clause governs the regulatory relationship between Congress and the States. *Id.* at 220. So when a "State acts solely as a market participant, no conflict between state *regulation* and federal regulatory authority can arise." *Id*. But the Privileges and Immunities Clause concerns the relationship between a State and the residents of another State. And the same discriminatory practice that does not affect Congress's legislative prerogative might well step onto Plaintiffs' individual rights. As the Court put it, "the fact that Camden is merely setting conditions on its expenditures for goods and services in the marketplace does not preclude the possibility that those conditions violate the Privileges and Immunities Clause." *Id*. *Smith Setzer*'s Commerce Clause holding, therefore, cannot inform the Privileges and Immunities analysis here. Nor can its Equal Protection holding, which rested on rational-basis review, *see* 20 F.3d at 1320—as explained above, the County bears a much higher burden in this case, *see Hicklin*, 437 U.S. at 536.

So that leaves only *Salem*, 33 F.3d 265, a decision no circuit has subsequently applied to allow discriminatory practices under the Privileges and Immunities Clause—not even the Third Circuit itself. And with good reason: *Salem*'s interpretation of Supreme Court precedent cannot be squared with *Camden*'s plain language. The *Salem* majority

21

makes much of *Camden*'s one-sentence proclamation that government employment "is qualitatively different from employment in the private sector," *see* 465 U.S. at 219, but as Judge Sloviter persuasively lays out in dissent, *Camden* made that statement while discussing the *Commerce* Clause, which it went on to distinguish from the Privileges and Immunities Clause for the reasons already discussed. *Salem*, 33 F.3d at 275. If anything, Judge Sloviter observed, *Camden* "*expanded* the scope of the Privileges and Immunities Clause by applying it to restrictions placed on employment of nonresidents by private employers on publicly-funded work projects." *Id.* at 273 (emphasis added). And the Court stayed resolute that public funding "does not remove the Camden ordinance from the purview of the Clause." *Camden*, 465 U.S. at 221. Elsewhere, too, the Court has cautioned that "a State's interest in its . . . resources must yield when, without reason, it interferes with a nonresident's right to pursue a livelihood in a State other that his own." *Baldwin*, 436 U.S. at 384, 386 (explaining that early cases appeared to grant States complete "power to preserve this bounty for their citizens alone" but that more recent cases walked back those unprincipled pronouncements). The Court has therefore given no indication that protectionist measures, which curtail fundamental individual rights, can escape Privileges and Immunities scrutiny merely because the government acts as a market participant.

But the Tax-Property statute fails even under the *Salem* rule because tax collection does not resemble state hiring or procurement practices in any way that matters. Individuals purchasing property, either for residence or investment purposes, are not state deputies being paid to collect taxes; they exercise their own, private rights. Nor does the traditional rationale for giving States "considerable leeway" when "setting conditions on

22

the *expenditure* of funds" apply to tax *collection*. *Camden*, 465 U.S. at 223 (emphasis added) (quoting *Toomer*, 334 U.S. at 396). When state "taxpayers foot the bill" for a certain program, *McBurney*, 569 U.S. at 228, a State may have a legitimate "preference that such monies be recycled within the local economy, either through the purchase of locally-produced products or through purchases from local vendors, rather than funneled out of state," *Smith Setzer*, 20 F.3d at 1323. But where, as here, the government is amassing money into its treasury, residents will only benefit if that money comes from without the County. The Attorney General fails to grapple with these critical differences. Nor, for that matter, have States been permitted to invade any other individual right the Constitution guarantees in the course of tax collection. A State cannot, for example, withhold more money from the paychecks of its black or female residents. So what would give the State authority to abridge the rights guaranteed by the Privileges and Immunities Clause? In the end, the Attorney General's attempt to take tax collection out of the Privileges and Immunities context simply lands too far afield. We apply the Clause as we usually do and hold the Tax-Property statute, § 14-817(d), unconstitutional.

Because the district court granted a consent motion specifying that liens that have already been purchased will not be voided if § 14-817(d) is enjoined, the injunction should apply "prospectively to future auctions" only. *See* Dist. Ct. Dkt., ECF No. 40 (June 24, 2020). Any liens already purchased at the limited auction remain valid.

23

IV.

Though Plaintiffs agree that the already-purchased liens should remain valid, they nonetheless ask us to hold them transferrable, arguing that the anti-alienation provision in § 14-821(b) should be declared unconstitutional as "a continuance of the discrimination against non-residents that is precluded by the Privileges and Immunities Clause." Pls.' Opening Br. 26. We agree, but for different reasons.

Plaintiffs offer no evidence to demonstrate how § 14-821(b), standing alone, abridges their Privileges and Immunities rights. But that makes good sense: Without the limited-auction provision, the anti-alienation clause can do no work, for it applies only to "certificate[s] of sale issued to a purchaser at a limited auction under § 14–817(d)." Md. Code Ann., Tax-Prop. § 14-821(b). When such a situation occurs, when "the remaining valid provisions alone are incomplete and incapable of being executed in accordance with legislative intent," Maryland instructs us to hold the provisions non-severable and enjoin Defendants from enforcing them. Md. Code Ann., Gen. Prov. § 1-210(b). The courts agree. *See, e.g.*, *O.C. Taxpayers for Equal Rts., Inc. v. Mayor & City Council of Ocean City*, 375 A.2d 541, 548 (Md. 1977) (a statutory provision cannot be severed if it cannot "be separately enforced"); *Davis v. State*, 451 A.2d 107, 114 (Md. 1982) (both provisions must fall "when the dominant purpose of a statute" cannot be "carried out" without the invalid provision).

We accordingly reverse the district court, hold that § 14-817(d) violates the Privileges and Immunities Clause and that § 14-821(b) cannot be severed from it, and remand with instructions to enter summary judgment in Plaintiffs' favor, enjoining

Defendants from conducting limited auctions under § 14-817(d) going forward and allowing the transfer of the already-purchased liens.

V.

For the foregoing reasons, the judgment of the district court is

*REVERSED AND REMANDED WITH INSTRUCTIONS.*